804 F.2d 216
 55 USLW 2328, 33 Cont.Cas.Fed. (CCH) 74,855
 CHEMUNG COUNTY, Plaintiff-Appellee,
v.
Elizabeth H. DOLE, Secretary of Transportation, Department
of Transportation; Donald D. Engen, Administrator, Federal
Aviation Administration; A.P. Bona, Jr., Facility Project
Officer, FAA Automated Flight Service Station; Federal
Aviation Administration; and Department of Transportation,
Defendants- Appellants,
and
Niagara Frontier Transportation Authority,
Intervenor-Defendant-Appellant.
 Nos. 211, 210, Dockets 86-6135, 86-6155.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 18, 1986.
Decided Oct. 28, 1986.
 
 John F. O'Mara, Elmira, N.Y. (Davidson & O'Mara, P.C., Elmira, N.Y., of counsel), for plaintiff-appellee.
 Patricia A. McNall, Federal Aviation Admin., Washington, D.C. (Theron A. Gray, Asst. Chief Counsel, Lawrence A. Brock, Manager, Acquisition Policy and Commercial Law, Federal Aviation Admin., Washington, D.C. and U.S. Dept. of Justice, Washington, D.C., Susan Sleater, Leonard Schaitman, Appellate Div., U.S. Dept. of Justice, Washington, D.C., of counsel), for defendants-appellants.
 Gary F. Kotaska, Buffalo, N.Y. (Moot & Sprague, Buffalo, N.Y., Richard F. Griffin, Michael A. Brady, Allithea E. Lango and Dominic J. Terranova, General Counsel, of counsel), for intervenor-defendant-appellant.
 Before LUMBARD, OAKES, and MINER, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 This dispute, before us for the second time, involves two New York counties seeking to be designated as the site of a new Federal Aviation Administration (FAA) facility. The controversy grew out of the FAA's announcement, after a lengthy bidding process, that an Automated Flight Service Station (AFSS) would be located in Buffalo and built by the Niagara Frontier Transportation Authority (NFTA).
 
 
 2
 Following the FAA's May 29, 1985 announcement, Chemung County, a disappointed bidder for the flight station, filed suit against the FAA seeking a declaratory judgment that contract for the AFSS should be awarded to Chemung and an order to the FAA to enter into a contract with Chemung.[1] On July 29, 1985, the United States District Court for the Western District of New York (Telesca, J.) found the FAA's decision to build the flight station in Buffalo arbitrary and capricious and awarded the contract to Chemung County. On August 14, 1985, the NFTA moved to intervene, sought injunctive relief and requested the District Court to set aside its July 29 decision and order. On August 26, the District Court granted the NFTA's motion to intervene, but declined to change its earlier ruling. On appeal, we held that the District Court did have subject matter jurisdiction, but vacated its order and remanded for further fact finding. See Chemung County v. Dole, 781 F.2d 963 (2d Cir.1986) (Chemung I). On remand, in a decision and order dated June 25, 1986, the District Court held that Buffalo area Congressmen had improperly influenced the FAA. As a result, the Court again held that the agency's decision to award the contract to the NFTA was arbitrary and capricious, and once more awarded the contract to Chemung County. The FAA and intervenor NFTA appeal the District Court's ruling. At the request of the parties, we granted an expedited hearing. Because we find that the FAA's decision to award the contract to NFTA to have been within its discretion and that the Congressional action was not improper, we reverse.
 
 
 3
 * 1. Background--On December 1, 1982, the FAA issued a solicitation for offers for an Automated Flight Service Station to serve the Western New York and Northwestern Pennsylvania Flight Plan Area, as part of a nation-wide consolidation of flight service stations. Aircraft pilots use flight stations prior to their departures to obtain weather reports and other information and to report flight plans. The pilots communicate with the flight station by telephone, with the station--that is, the FAA--paying for the telephone calls. The FAA's solicitation instructed bidders to estimate the costs of a variety of factors relating to the construction and operation of the flight stations, but did not invite estimates of certain other costs. In these other areas, the FAA itself computed the costs and, when the bidding was completed, informed the bidders of its estimates. Among the costs of operating a flight station that the FAA computed were those relating to telecommunications.
 
 
 4
 The FAA received eleven bids by the January 31, 1984 deadline for "best and final" offers. Under the then applicable statute, 41 U.S.C. Sec. 253(b) (1982), the FAA was required to award its contracts to the bidder submitting the proposal "most advantageous to the Government, prices and other factors considered[.]" Chemung County's submission of $7,451,716 to build and lease a flight station in Elmira, New York, was the lowest bid. NFTA's bid of $7,526,091 was second. The FAA accepted Chemung County's bid informally on November 30, 1984, but never executed a contract with Chemung. On December 4, 1984, the FAA, acting under statutory obligation notified the NFTA that Chemung had been selected. "Enclosed in the letter was a summary of the FAA's estimated life cycle costs for all offerors. This indicated that the NFTA had a telecommunications cost advantage over Chemung of $10,000--due to the large number of pilots residing in the Buffalo area who could utilize the services of the flight station within the local telephone calling area--it concluded that an error had occurred in the evaluation of its offer." Chemung I, supra, 781 F.2d at 965.
 
 
 5
 Believing the FAA computations to be incorrect, the NFTA contacted the Congressmen representing the Buffalo area, Jack Kemp and Henry Nowak, who, on December 6, 1984, requested the General Accounting Office to investigate the FAA decision. In response to this letter, the GAO assigned an investigator familiar with the AFSS selection process to examine the award of the contested Western New York-Northwestern Pennsylvania facility. Once the GAO investigation began, the Congressmen wrote to the FAA to request that it not enter into a lease with Chemung County while the investigation was underway. The investigator, Thomas Hubbs, met with the staffs of the two Congressmen and stated that he would limit his investigation of the telecommunications cost estimates to Buffalo (and no other bidders) so that his work could be completed quickly.
 
 
 6
 2. The Computation of Telecommunications Costs--When Hubbs began his investigation, the GAO had already examined the FAA procedures regarding computation of telecommunications costs. The GAO had, in fact, already investigated the accuracy of FAA determinations of telecommunications costs while the contested AFSS project was up for bid. In a letter to the chairman of the FAA dated June 21, 1983, the first GAO report expressed concern about "lack of guidance in [AFSS] bid applications which could result in higher costs to FAA." Specifically, the GAO report revealed that some existing flight stations had widely varying telecommunications costs depending on the type of phone services they used. The report thus questioned the FAA's assumptions that all the new flight stations would use only toll-free telephone lines and that all the flight stations would have substantially similar telecommunications costs. In short, the GAO found that a mixture of local, foreign exchange ("FX") and In-WATS lines might be less expensive than In-WATS alone. The cost of a foreign exchange line between two locations is dependent solely on the distance between the locations. An In-WATS line, or "800" number, allows a pilot to call the station toll-free from any location within the geographic area. In response to this report, the FAA sent a memo on August 17, 1983 to all of its Regional Directors informing them that the FAA would now be considering a mix of telephone services; but the memo did not instruct the local FAA offices to notify existing bidders of the change in policy, or to offer them the opportunity to change their bids.
 
 
 7
 The August 17 memo did not satisfy GAO, and on October 13, 1983, the FAA issued new, more specific guidelines regarding the computation of telecommunications costs. The new guidelines called for the FAA to use "the most economical mix of lines (i.e., foreign exchanges, In-WATS, local)," and established a formula--based principally on the number of "services" a flight station provided--to compare bidders' respective telecommunications costs. On March 3, 1984, the GAO expressed satisfaction with the new FAA guidelines.
 
 
 8
 When the telecommunications costs for the AFSS for Western New York and Northwestern Pennsylvania were computed on April 18, 1984, however, the "mix of lines" approach was not used; Richard Rearick, who performed the analysis for the FAA, computed the figures assuming that each facility would only use In-WATS lines. He did so because he understood the FAA regulations to require FAA employees to "use what you know" and the latest information available to him from New York Telephone was that FX rates were about to "skyrocket." He relied on computations provided by one Sammie Stover, but the FAA never produced those computations at trial.
 
 
 9
 It was against this background that Hubbs began his investigation in January 1985. Chemung County officials were not informed of Hubbs' investigation and did not participate in it. Hubbs met with one A.P. Bona, Jr., who was the FAA project officer for the AFSS and a defendant in this case, and spoke by telephone with Rearick. This is how Hubbs learned that Rearick had used the all In-WATS computation. A memo by Bona to his own file indicated that Hubbs' investigation had concluded that even if FX line costs were to triple, the FAA had still overestimated costs in Buffalo by using all In-WATS. Hubbs' notes indicate his conclusion that the all In-WATS computation had significantly overstated Buffalo's costs. This view is not surprising, of course, because a densely populated area like Buffalo would certainly have a significant percentage of its calls come in over local--that is, low-cost--lines. Informed by Hubbs of this deficiency in the original calculations, Kemp and Nowak wrote to the head of the FAA to inform him of this purported error and request that the bids be re-evaluated.
 
 
 10
 As a result of the Hubbs investigation, Rearick was instructed by his superiors at FAA to re-figure the telecommunications costs for all bidders, this time with a mix of lines. Our remand order of earlier this year instructed the District Court to decide "whether the FAA improperly considered two new factors in its re-evaluation, revised estimates of the volume of traffic at Buffalo and figures based on services required for Syracuse, New York, or whether the FAA properly re-evaluated its decision in light of national guidelines applicable to telecommunications costs." Chemung I, supra, 781 F.2d at 971.
 
 
 11
 3. The Re-Calculation--Rearick based his re-calculation on the FAA guidelines which he should have used originally--those issued on October 13, 1983, to establish a new methodology for estimating AFSS communication costs. The new test called for the FAA to collect two sets of figures; these figures were, in turn, used in a formula to determine the total communications costs for each prospective AFSS site. The first number required for the formula was the number of flight services that each prospective location would provide. A "service" is either a flight plan or weather briefing provided to a pilot; a pilot often obtains more than one "service" in the course of one telephone call. The second group of figures consisted of estimates of the origins of demand for flight services--that is, the origins of the telephone calls that an AFSS would receive. These figures were then to be inserted into a formula which would allow the FAA to estimate the number of phone lines required to handle the telecommunications needs of the AFSS. Once the FAA had used the formula to compute the overall level of demand, it could then use these results to compute the most economical mix of telephone lines. For example, if all the calls came primarily from nearby the AFSS, the analyst could compute the costs using mostly local lines; if the calls came from a broader area, the analyst needed to consider the addition of more FX and In-WATS lines.
 
 
 12
 Ian G. Wolf of the FAA's Air Traffic Division collected the data for the re-calculation. Wolf obtained the information for the first number in the formula--the number of flight services each location would provide--simply by obtaining the flight service figures from each of the existing flight service stations in the AFSS area. These flight stations were required to keep monthly reports of the number of "services" they provided. He confirmed these numbers by calling each of the existing flight service stations. When he called these stations, he also asked the local managers to estimate the origins of the calls they received--to obtain the numbers required for the second variable in the formula.
 
 
 13
 Wolf was able to make a more precise estimate of the origin of the calls made to the existing Buffalo flight station than to any other station. Unlike any of the others, the Buffalo station had an automatic counter which recorded the precise number of calls received on each of the Buffalo station's lines. Wolf was thus able to determine the origin of the Buffalo calls by counting the calls received on Buffalo local lines as coming from the local calling area; those received on FX lines as coming from the city where the line was located; and those received on the WATS lines as coming from unspecified points outside the local calling area. These figures, of course, could only be used to determine the origins of calls. To determine the number of services in Buffalo, as opposed to calls, Wolf relied on the monthly figures compiled by the flight station staff--just as he relied on that source for the other flight stations.[2]
 
 
 14
 Wolf having collected all the relevant raw data, Rearick was left only to apply the formula. The first time he computed the new costs Rearick applied the then current (i.e. 1985) telephone rates to the figures given to him by Wolf. He presented these figures to FAA officials in a meeting in April 1985. His figures indicated that Elmira, which in the original computations had the third lowest telecommunications costs behind Rochester and Buffalo, now ranked ninth of the eleven bidders. However, at that meeting, the FAA decided that Rearick had erred by using the 1985 rates, rather than the rates in effect during his earlier computations between February and April of 1984. Rearick was told by his superiors to destroy his most recent computations and try again.[3]
 
 
 15
 Rearick then re-calculated using the 1984 rates. These findings were dated April 22, 1985. Under these calculations Elmira had the fifth lowest costs, and Buffalo was again second. The 1985 vs. 1984 re-calculation thus favored Elmira but not enough to make up the difference with Buffalo. The new figures showed that Elmira would be more than $40,000 per year more expensive than Buffalo. On May 10, 1985, GAO officials met with FAA regional officials to review the April 22 figures. They agreed that the figures had been compiled using a "mix" of lines, as the new guidelines required.
 
 
 16
 4. Conclusion--On May 24, 1985, the FAA published an in-house report of its re-examination, wherein it concluded that, under the re-calculation, Buffalo ranked first among the bidders with a total 20-year discounted cost of $6,329,369 and that Elmira was second with $6,592,609. On May 29, the FAA officially awarded the contract to Buffalo and the NFTA.
 
 II
 
 17
 The issue before the District Court was a narrow one: whether the FAA "improperly considered two new factors in its re-evaluation"--the estimates relating to services required in Buffalo and Syracuse. The District Court interpreted this instruction as an invitation to evaluate whether improper political pressure had been brought to bear to assure the selection of Buffalo. Accepting the view that the political pressure issue was before the District Court, we cannot agree that the actions of the Buffalo area Congressmen justified a finding that the FAA award was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A) (1982); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413-14, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971).
 
 
 18
 The standard for determining whether political influence on a federal administrative agency is improper is stated in Town of Orangetown v. Ruckelshaus, 740 F.2d 185 (2d Cir.1984). There we held that "To support a claim of improper political influence on a federal administrative agency, there must be some showing that the political pressure was intended to and did cause the agency's action to be influenced by factors not relevant under the controlling statute." Id. at 188.
 
 
 19
 The full extent of Representatives Kemp and Nowak's efforts on behalf of the NFTA was their having written letters to the FAA[4] and their staffs having met with the GAO investigator. Appellees object to the Representatives' letter to the FAA asking it to refrain from formally entering into a contract with Chemung County while the GAO audit was underway. The FAA had a right to suspend performance of a contract pending a GAO audit. See 41 U.S.C. Sec. 605(b) (1982); 31 U.S.C. Sec. 3553 (1985 Supp.). If the audit proved that NFTA had submitted the lowest bid (as it did so prove), the FAA had the obligation to award the contract to NFTA. See 41 U.S.C. Sec. 253b (1982); 41 C.F.R. Sec. 101-18.1(b) (1984). Thus this letter urged the FAA to take action directly authorized by the statutory scheme governing the award of contracts.
 
 
 20
 Similarly, the Representatives' letter to the FAA urging the agency to re-evaluate its telecommunications cost estimates in light of the GAO's findings was also proper. This letter was also an attempt to persuade the FAA to abide by its statutory obligations, not ignore them. As noted above, an award of a government contract to anyone except the bidder with the most advantageous proposal would violate the FAA's statutory obligations, and the Representatives acted properly in bringing a possible violation of this duty to the agency's attention--even if it helped their home districts.
 
 
 21
 That the GAO investigator met with the staffs of the Buffalo but not the Elmira Representatives may have been discourteous, as the District Court suggested, but it was not illegal or in any way contrary to the FAA's statutory obligations. Thus, the District Court's reliance on Delta Data Systems Corp. v. Webster, 744 F.2d 197, 203 (D.C.Cir.1984), is misplaced. There then-Judge Scalia stated that when "new information is of uncertain import, is likely to determine the award, and is of such a nature that the offeror is likely to be able to make a significant contribution to its interpretation, it is an abuse of discretion for the agency to act on the basis of the information without giving the offeror an opportunity to discuss it." Delta Data dealt with information received before the closing date for "best and final" offers; the instant case concerns information received after bids were due, and neither Buffalo nor Elmira bidder could change their bid. After bids were due, the FAA had no obligation to conduct any negotiations with the bidders. See Airco, Inc. v. Energy Research and Development Admin., 528 F.2d 1294, 1298 (7th Cir.1975). More important, Delta Data dealt only with information which the "offeror is likely to be able to make a significant contribution to its interpretation." 744 F.2d at 203. There the issue in question was the financial condition of one of the bidders. Here, the GAO was investigating FAA procedures for measuring telecommunications costs. Chemung County had no particular information or expertise to contribute to that endeavor.
 
 III
 
 22
 Appellees also contend that the information collected by Wolf regarding the Buffalo figures was so flawed as to render any decision based on it arbitrary and capricious.[5] We cannot agree.
 
 
 23
 The District Court found three specific FAA actions to be arbitrary and capricious. First, the Court found arbitrary the FAA's comparison of the demand for phone services between the flight service centers that did not use automatic counters to record the number of phone calls and the one service center that did use an automatic counter, Buffalo. To establish the number of calls received by all the service centers except Buffalo, the FAA had relied on estimates made by the managers of these service centers. Undisputed testimony supported the reliability of these estimates. Moreover, rejection of these estimates would require the FAA to install phone counters in every flight service station and then to wait a year to develop figures. The District Court thus ignored the rational policy judgment of the FAA that such a method would be too costly, both in terms of time and money, to justify the supposed increase in reliability. Finally, use of the estimates was in no way contrary to the commands of the FAA guidelines, and previous FAA guidelines had specifically suggested using flight managers' estimates in stations where there were no automatic counters.
 
 
 24
 The second FAA action found wanting by the District Court was the failure of the FAA to "verify" the flight managers' estimates. No such verification is required by statute or by the FAA guidelines; moreover, there was no testimony that verification of these estimates was possible, much less that verification would have measurably improved the reliability of the figures. Finally, the District Court noted a numerical error in the FAA's record of the number of telephone calls the Buffalo service center had received in 1984. It is uncontested that there was such an error, but the error was in Elmira's favor; it thus does not support the Court's award of the contract to Elmira. In sum, then, the record does not support the District Court's decision to reject the considered judgment of the FAA and award the contract to Chemung County.
 
 IV
 
 25
 The judgment of the District Court is reversed, with instructions to enter a judgment affirming the Federal Aviation Administration's award of the contract to the Niagara Frontier Transportation Authority.
 
 MINER, Circuit Judge, dissenting:
 
 26
 Our instructions on remand went beyond the narrow limitations ascribed to them by the majority and permitted the district court to declare Chemung the successful bidder upon a finding that "the FAA acted arbitrarily and capriciously in improperly recalculating costs, not made part of the solicitation, in its re-evaluation and in then recognizing the NFTA as the successful offeror...." Chemung I, 781 F.2d at 971. Since the FAA purported to undertake the recalculation of telecommunications costs in accordance with the guidelines it had adopted at the urging of the GAO, the issue to be resolved on this appeal simply is whether or not those guidelines were followed. An examination of the record persuades me that the FAA's computation of telecommunications costs violated its own guidelines, that its decision to award the flight station contract to NFTA therefore was arbitrary and capricious, and that the judgment of the district court should be affirmed.
 
 
 27
 Specific standards for estimated telecommunications costs are established by the guidelines. First, the "most economical mix" of telephone lines must be used for pilot access. Any mix of lines--local, foreign exchange ("FX"), or in-WATS--may be employed, so long as the most economical mix is obtained to meet current levels of demand. Second, the number of lines required for each type of "service" (here, "service" means type of telephone trunk line) should be based on the level of demand and the point of origin of demand. Third, the guidelines provide a complex formula as a "rule of thumb" to estimate the number of telephone lines required to serve a given level of demand. They also provide that "[a]llocating the demand to the different trunk circuits may be estimated by operations personnel if line counter data is not available in the facility." Joint App. at 754 (emphasis added). Further, although use of total "services" (in this context, yearly flight plans and weather briefings) is contemplated in the formula, the figure to be derived is the total number of calls during the busy hour, which then essentially is divided by ten to arrive at the total number of lines required. Finally, the FAA guidelines also provide that when an FSS station has a mix of lines, as both Elmira and Buffalo did, calculations must be made for each type of "trunk service" provided.
 
 
 28
 Applying these guidelines, it becomes apparent that the FAA's use of "services" (flight plans and weather briefings) to calculate demand at Buffalo, see Joint App. at 604-05, was unwarranted. While the guidelines formula is designed to calculate demand levels by use of the "services" factor, there is no need to employ that factor where actual call data is available. The guidelines make it clear that allocation of demand to the different trunk lines may be estimated only if counter data is not available. Common sense dictates the same approach. Since the number of "busy hour" calls were reflected on the line counters, the remainder of the formula computations could have been undertaken in reliance on the accurate information at hand. Instead of proceeding in this fashion, the FAA inserted "services" numbers into the equation, ignoring the Buffalo counter evidence of actual use. The FAA procedure produced skewed results. Acceptance of the distorted product engendered by imput of the "services" factor led to the obvious conclusion that Buffalo offered a competitive advantage over Elmira, which would need some form of long distance line to substitute for each of Buffalo's local lines.
 
 
 29
 In her closing statement, the attorney for the FAA said: "[P]utting in counter figures into that formula is irrational, especially in the situation like this where only one of the flight service stations in a particular automated flight service station flight plan area has a counter." Joint App. at 605. Curiously, in its point of origin determinations, the FAA considered it quite rational to use available counter data for the Buffalo station together with estimates for all the other stations. In any event, I am of the opinion that it was arbitrary and capricious, as well as irrational, not to follow the guidelines and use actual data, where available, to determine demand levels.
 
 
 30
 Also violative of the FAA guideline was the FAA's use of 1984, rather than 1985, telephone rates in its re-evaluation. Although the initial recalculation was based on 1985 rates, which were then available, the FAA ordered a further recalculation using 1984 tariffs. Dennis DeGaetano, the author of the guidelines, testified in a deposition that the guidelines call for use of "the rates in effect at the time of the calculation." Joint App. at 353. It was his opinion that this referred to the time of the original calculation. Actually, the guidelines are not so specific as Mr. DeGaetano would have them. However, they do speak of rates in the present tense, e.g., the "current 260 tariff" for interstate rates and "intrastate rates are standard," and therefore require the latest available data. Moreover, it defies logic to conclude, as has the FAA, that "the most economical mix of lines" can be determined without using the most current rate information.
 
 
 31
 There is a claim that use of the 1984 tariffs was favorable to Elmira. NFTA attempted to introduce into evidence an undated set of calculations purporting to show that use of the 1985 rates caused Elmira's bid to descend in the ranking of telecommunications costs. That exhibit was not put into evidence, however, because all of the supporting documentation for 1985 was willfully destroyed by the FAA, supposedly because having such information in the file would "muddy up things." Joint App. at 202. The district court correctly observed that such admitted and willful destruction could give rise to a strong inference that production would have been unfavorable to the spoliator. Joint App. at 736 (citing Dow Chemical Co. (U.K.) v. S.S. Giovanella D'Amico, 297 F.Supp. 699, 701 (S.D.N.Y.1969) ). The district court chose, however, merely to exclude the proffered exhibit from evidence. Accordingly, there is no way to determine whether the 1985 rates favored Elmira or not, Mr. Rearick's testimony on this issue having been predicated on the rejected exhibit. In my view, the use of the older rates, when combined with the intentional destruction of supporting material consisting of calculations based on more current rates, leads inexorably to the conclusion that the FAA could not have determined the most economical mix of lines, primarily because the information supplied was outdated. Combining this conclusion with the fact that the FAA projected future costs for telecommunications without accounting for future rate changes, I am constrained to conclude that the FAA's use of 1984 rates was arbitrary and capricious.
 
 
 32
 For the foregoing reasons, I respectfully dissent.
 
 
 
 [1]
 The Niagara Frontier Transportation Authority, an independent public authority, owns and operates a variety of transportation facilities in Niagara County, New York, which includes the city of Buffalo. NFTA submitted a bid to the FAA to build the AFSS in Buffalo, New York. Chemung County, a unit of local government, submitted its bid to build the facility in Elmira, New York
 
 
 [2]
 The dissenting opinion faults the FAA for relying on Buffalo's record of its "services" as opposed to its automated record of "calls." All of the existing flight stations had records of "services;" only Buffalo had an automated counter of "calls." Furthermore, the formula in the guidelines specifically called for the use of "services." Thus by comparing the "service" figures for Buffalo with the "service" figures for the other flight stations, the FAA simply used the only common denominator available--an action which comports with the guidelines as well as common sense
 
 
 [3]
 The dissenting opinion apparently does not question the good faith of the FAA's belief that use of the 1984 rates was appropriate for the re-calculation; nor do we. Thus because the FAA reasonably believed the 1985 rates were irrelevant, its failure to produce its computations based on those rates was similarly of no consequence
 
 
 [4]
 The first of the letters by the Buffalo Representatives, the request to the GAO for an investigation, was found proper by the District Court, and this ruling is not challenged on appeal. A letter by Representative Kemp asking Secretary of Transportation Dole not to approve re-location of another FAA facility from Buffalo is irrelevant to the instant dispute. Finally, a letter from Kemp and Nowak to the FAA urging that the FAA join NFTA's motion for reconsideration was not improper. The FAA did not in fact join the motion, and, in any event, the FAA had a right to move for a new hearing under Fed.R.Civ.Proc. 59-60
 
 
 [5]
 Appellees do not contend that there was any error by the FAA in the second area which we instructed the District Court to consider--"the services required for Syracuse." Chemung I, supra, 781 F.2d at 971