**DELTA DATA SYSTEMS
CORPORATION**

v.

**William H. WEBSTER, Director, Federal
Bureau of Investigation, et al., and Sys-
tem Development Corporation, Appel-
lants. (Two Cases)**

Nos. 84–5356, 84–5362.

United States Court of Appeals,
District of Columbia Circuit.

Argued July 11, 1984.

Decided Sept. 21, 1984.

Stuart Henry Newberger, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., and Anthony J. Steinmeyer, Atty., Dept. of Justice, Washington, D.C., were on the brief, for federal appellants.

William H. Butterfield, Alexandria, Va., with whom Bernard Fried, Camarillo, Cal., was on the brief, for appellant System Development Corporation. .

Thomas Earl Patton, Washington, D.C., with whom Paul G. Dembling and Sharon Freed, Washington, D.C., were on the brief, for appellees.

Before ROBINSON, Chief Judge, BORK and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

The district court in this government procurement case concluded that the FBI had acted irrationally and arbitrarily and had violated federal procurement law in awarding a contract for computer terminals and other equipment to System Development Corporation, a subsidiary of Burroughs Corporation ("SDC"). It enjoined the FBI to terminate that contract and to enter into a contract with the disappointed bidder, Delta Data Systems Corporation ("Delta Data"). We denied the Government's emergency motion for suspension of the injunction, but expedited the appeal. Our judgment was announced by order entered July 16, 1984, 740 F.2d 58, vacating the injunction, permitting the FBI to reinstate its contract with SDC pending further proceedings, and directing the district court to order the FBI to make a *nunc pro tunc* reselection of contractor if Delta Data so requested. The same order noted that this opinion would follow.

I

In September 1982, the FBI issued solicitation or Request for Proposal ("RFP") No. 2591, to supply over a period of eight years more than 6,000 computer terminals, in addition to printers and disk devices. The equipment was to form part of the FBI's nationwide information and communications system, and was to be "Tempest-qualified," *i.e.*, proof against electronic eavesdropping. The RFP called for 240 "baseline" terminals and 5,976 "enhanced" terminals, of which 1,244 were to have word processing capability.

The RFP provided that award would be made to the offeror meeting all mandatory requirements with the highest total evaluated score based on four weighted factors: (1) cost (55%); (2) vendor considerations (20%); (3) live test demonstration (15%); and (4) desirable features (10%). The RFP defined each of these factors to include a number of subfactors; those pertinent to "vendor considerations" were past performance, soundness of approach (*i.e.*, risk factor), operational reliability, vendor support, and technological evolution. Neither financial condition of the offeror nor any other financial consideration relating to the offeror was expressly identified as an evaluation criterion. The RFP also set forth in detail the scoring methodology to be applied in assessing each factor and in determining each offeror's total score. The RFP was amended ten times during the seven-month period from September 13, 1982 through April 15, 1983 to reflect changes in the FBI's requirements.

Initial offers were received on or about May 2, 1983 from four sources: Delta Data, SDC, International Business Machines Corporation ("IBM"), and Data Products of New England. The last was eliminated at the outset as technically non-responsive. Delta Data submitted alternative proposals. We shall be concerned only with the higher-scored Delta Data proposal and the SDC proposal. The FBI's Technical Evaluation Committee completed its work on these proposals and submitted the following ratings to the Contracting Officer, William E. Baugh, Jr., in a memorandum dated September 1, 1983:

| ITEM | SDC | DD |
|------|-----|-----|
| Vendor Considerations | 18.0723 | 20.0000 |
| Live Test Demonstration | 14.0789 | 14.8552 |
| Desirable Features | 10.0000 | 9.7211 |
| Total | 42.1512 | 44.5763 |

In mid-to-late September 1983, the Contracting Officer requested a Dun & Bradstreet Report on the two bidders who had the best chance of being selected for award, namely, Delta Data and SDC. This was standard FBI practice in preparation for the determination of contractor responsibility that must be made before any award is concluded. Dun & Bradstreet gave SDC its second highest rating. It declined to rate Delta Data, reporting that, as of August 1983, that company was in an "unbalanced condition." No explanation of the term "unbalanced condition" was provided.

On September 22, 1983, in response to an oral request for financial information, Delta Data hand-delivered to the FBI: (1) Delta Data's 1983 annual report; (2) its first quarterly report for the period March through June 1983; (3) its October 13, 1982 proxy statement; (4) its Securities and Exchange Commission form 10Q Quarterly Report for the quarter ending June 30, 1983; and (5) a letter dated September 22, 1983 from Stephen G. Woodsum of the Boston Investment firm of TA Associates, expressing the support of TA Associates and the Allstate Insurance Companies for Delta Data and saying that under appropriate circumstances they would consider making a large new investment in the company.

On September 26, 1983 the Contracting Officer requested Special Agent Michael Ayers, a certified public accountant, to review the financial information concerning Delta Data's financial condition. Ayers reported that Delta Data (1) was in default to preferred shareholders; (2) had furnished the FBI with an unaudited financial statement; (3) was in the process of renegotiating long term debts to meet current obligations; and (4) had made sizeable loans to its corporate officers at low or no interest for stock purchases. On the same day, Ayers orally provided the same assessment to the Technical Evaluation Committee. He did not mention TA Associates' expression of support for Delta Data. The Chairman of the Technical Evaluation Committee inquired whether additional information could be obtained regarding Delta Data's financial condition, but was told that the FBI had obtained all data available at that time. The Technical Evaluation Committee thereupon reevaluated Delta Data's "vendor considerations." It lowered Delta Data's score for four of the five "vendor

considerations" criteria set forth in the RFP: soundness of approach (risk factor); operational reliability; vendor support; and technological evolution. This automatically raised the "vendor considerations" scores of the competing offerors, since the formula required dividing each offeror's score by the highest score obtained. Thus, the result was a "vendor considerations" score for SDC of 20 (up from 18.0723); and for Delta Data of 11.1273 (down from 20).

These changes produced the following overall technical rankings, based on the reevaluated "vendor considerations" scores and on the unchanged "live test demonstration" and "desirable features" scores: SDC 44.0789 and Delta Data 35.7036. When these were combined with evaluated cost scores, the final rankings were: SDC 92.96 and Delta Data 90.71.

On the basis of these evaluations, the Contracting Officer recommended that the award be made to SDC. On September 28, 1983, the Contract Review Board, which has *de novo* review authority over major FBI procurements, met to review the recommendation. The presentation to the Contract Review Board included a report on the offerors' relative financial strength, substantially similar to the information that was reported by Special Agent Ayers to the Contracting Officer and the Technical Evaluation Committee. The board approved the recommendation, and on September 29, 1983, the FBI awarded the contract to SDC. On October 13, Delta Data filed a protest of the award with the General Accounting Office. In its protest, as in its later complaint to the district court, Delta Data alleged two deficiencies: (1) The FBI had improperly considered Delta Data's financial condition in its technical evaluation of the proposals, and (2) SDC's proposal failed to meet mandatory requirements set forth in the solicitation.

The GAO issued an opinion on April 17, 1984. *Delta Data Systems Corp.*, B–213396, 84–1 CPD ¶ 430. It concluded that the FBI had improperly considered Delta Data's financial condition because that factor may not be comparatively evaluated

under technical criteria unless the procuring agency demonstrates that special circumstances justify that course. The GAO suggested that SDC's proposal might have been unresponsive to the solicitation, and found that at best the solicitation was ambiguous. It recommended that the FBI reconsider Delta Data's proposal with consideration of financial condition limited to a responsibility determination.

The FBI declined to accept this recommendation, and Delta Data brought suit in federal district court pursuant to the provision of the Administrative Procedure Act establishing that forum for challenges to agency action not covered by special statutory review provisions, 5 U.S.C. § 703 (1982). As noted earlier, the district court concluded that the FBI's action in awarding the contract to SDC was arbitrary and capricious and in violation of federal procurement law, *cf.* 5 U.S.C. § 706(2)(A), (D); it enjoined the Bureau to terminate that contract and to award the work instead to Delta Data. *Delta Data Systems Corp. v. Webster*, 589 F.Supp. 355 (1984). This appeal followed.

II

In all government procurements, an offeror's financial condition is a factor in determining what is called contractor responsibility. *Cf.* 41 C.F.R. § 1–1.1203–1 (1983). Responsibility assessments are made after proposal evaluation and determine whether an offeror has the capacity to perform the work. There are no gradations: the contractor is either responsible or nonresponsible. In contrast, evaluation criteria, as we have seen, are used to make graded assessments of the relative merits of individual proposals. *See Design Concepts, Inc.*, B–184754, Dec. 24, 1975, 75–2 CPD ¶ 410.

In negotiated procurements such as this, however (governed by 41 C.F.R. Part 1–3), as opposed to procurements by formal advertising (governed by 41 C.F.R. Part 1–2), the line between responsibility factors and proposal evaluation factors is not a sharp one. The procurement regulations require

that "*[d]uring the course of negotiations, due attention shall be given to ... [c]omparison of the business reputation, capacity, and responsibility* of the respective persons or firms who submit offers." 41 C.F.R. § 1–3.102(b) (emphasis added).

Responsibility is a broader concept than mere financial capacity and includes such factors as ability to make timely deliveries, record of past performance, integrity and business ethics. *See* 41 C.F.R. § 1–1.1203–1(b)(c), (d). The GAO has "long held that in negotiated procurements, it is appropriate to use traditional responsibility factors as technical evaluation criteria." *Anderson Engineering & Testing Co.*, B–208632, Jan. 31, 1983, 83–1 CPD ¶ 99 at 4 (citations omitted). Recently, however, the GAO announced that it should ordinarily not be necessary for an agency to make a comparative evaluation of financial condition in the technical evaluation of proposals, even though it might be appropriate to consider other responsibility factors such as organization, technical experience, equipment and facilities. In most cases, the GAO said, financial data should be considered only in the responsibility determination. It should be used as a technical factor only rarely, and then only if the agency fully justifies its use. *Andover Data Services, Inc.*, B–209243, May 2, 1983, 83–1 CPD ¶ 465.

Applying this criterion to Delta Data's protest in the present case, the GAO concluded that the FBI was not justified in its comparative evaluation of the offerors' finances. We need not decide here the validity of the GAO's general criterion in face of the regulations' clear mandate that business responsibility should be considered in the course of negotiations. To resolve this case, we hold only that in the context of this procurement it was reasonable for the agency to consider financial data outside the dichotomous determination of financial responsibility or irresponsibility.

■ We are fully aware of the "accumulated experience and expertise" of the GAO, *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1305 (D.C.Cir.1971), deriving from its long experience in settling contract-related public accounts and its practice of providing pre-expenditure advice regarding the legitimacy of contract awards, *see* A. GALLAGHER, THE LAW OF FEDERAL NEGOTIATED CONTRACT FORMATION 344–346 (1981). In the era before this court found standing to challenge the denial of contract awards, *see Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970), the pre-expenditure determination by GAO—almost universally followed by the agency—was as a practical matter conclusive. In principle, however, the GAO's advice is not binding upon the agency,[1] much less upon the courts. Thus, the recent legislation (not yet in effect) which "codifies and strengthens the bid protest function currently in operation," H.R.Rep. 861, 98th Cong., 2d Sess. 1435 (1984), refers to the Comptroller General's prescriptions following upon his determination of illegality as "recommendations." Deficit Reduction Act of 1984, Pub.L. No. 98–369 § 2741(a), 98 Stat. 494, 1201 (to be codified at 31 U.S.C. § 3554(b)). It provides as a sanction for agency failure to accept such recommendations only that the Comptroller General shall report such failure to Congress in an annual report, *id.* (to be codified at 31 U.S.C. § 3554(e)(2)); and specifically states that the legislation shall not affect "the right ... to file an action in a district court of the United States or the United States Claims Court," but that in such an action "any decision or recommendation of the Comptroller General ... shall be considered to be part of the agency record subject to review," *id.* (to be codified at 31 U.S.C. § 3556). In short, we regard the assessment of the GAO as an expert opinion, which we should prudently consider but to which we have no obligation to defer. We reject appellee's conten-

---

1. ₅ Since the GAO has been thought to be "an arm of the legislature," *M. Steinthal & Co. v. Seamans, supra,* 455 F.2d at 1305, *cf.* 5 U.S.C. § 133z–5 (1964), there might be a constitutional impediment to such binding effect. *See INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

tion that every decision of the GAO should be adopted and enforced by the court unless that decision lacks a rational basis.[2] On the contrary, it is "the court [that has] the last word and [it] should not shrink from exercis[ing] its power." *Wheelabrator Corp. v. Chafee*, 455 F.2d 1306, 1316–17 (D.C.Cir.1971). *See also Keco Industries, Inc. v. Laird*, 318 F.Supp. 1361, 1363 (D.D.C.1970).

■ The contract here in question is scheduled to run for eight years, and its ultimate success will depend in significant measure on the vendor's future ability to implement its proposals with a high degree of quality, and to service, support and update its equipment over that entire period. For this reason, the RFP specified that proposals would be evaluated not only for their content, but also with regard to the characteristics of the offerors who made them ("vendor considerations"). The FBI might rationally conclude that of two firms which were financially strong enough to be found minimally responsible in a responsibility determination, the financially stronger offered significantly better prospects of satisfactory future performance in a contract of this type. This is the sort of issue to be decided in the first instance by the agency rather than the courts. We cannot find the FBI's decision arbitrary, and have no authority to compel the disregard of evidently relevant factors absent a clear statutory prohibition.

That Delta Data meets the statutory definition of a small business does not alter our analysis.[3] When an agency determines that a small business is not responsible, it must, before rejecting the bid on those grounds, make a referral to the Small Business Administration for a certificate of competency—which, if provided by SBA, will foreclose the responsibility issue. 15 U.S.C. § 637(b)(7)(A), (C) (1982); 41 C.F.R. § 1–1.708–2, –3. The GAO expressed some concern in the present case that consideration of financial data in comparative evaluations of proposals permits circumvention of this requirement. *Delta Data Systems Corp., supra*, B–213396, 84–1 CPD ¶ 430 at 7. Although some possibility of circumvention may exist, it seems to us impossible to interpret the statute to prevent this. SBA certificates of competency, it must be noted, are not limited to financial matters but extend to "all elements of responsibility, including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, and tenacity." 15 U.S.C. § 637(b)(7)(A). We cannot believe Congress intended that, when small businesses are among the offerors, consideration of all these factors must be limited to the narrow confines of an up-or-down responsibility determination.

■ The statutory directive mandating referral to the SBA applies only when responsibility factors "preclude" a small business from being awarded a contract. *Id.* The verb "preclude," with its connotation of an absolute barrier to award, suggests that the provision was intended to apply to formal responsibility determinations under 41 C.F.R. § 1–1.1204–1 and not to the weighing of responsibility factors in the process of proposal evaluation. Nothing in the legislative history of the relevant provision of the Small Business Act speaks to the question. *Cf.* H.R.Rep. No. 1, 95th

---

2. Of course even when a GAO decision is incorrect, in at least some circumstances an agency's acquiescence in it, "as a means of minimizing a conflict with another arm of Government," *John Reiner & Co. v. United States*, 325 F.2d 438, 442 (Ct.Cl.1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964), may preclude a finding that the agency's action is arbitrary or capricious. *See M. Steinthal & Co. v. Seamans, supra*, 455 F.2d at 1305.

3. In common parlance, Delta Data is not a small business. Obviously, considerable resources are required to compete effectively for a $50 million computer contract. The Small Business Act, however, defines a small business as one which is independently owned and operated and is not dominant in its field. *See* 15 U.S.C. § 632(a) (1982). While the Administrator of the SBA is authorized to add further detail to this definition, the statute requires that "the maximum number of employees which a small-business concern may have ... shall vary from industry to industry to the extent necessary to reflect differing characteristics of such industries," *id.*

Cong., 1st Sess. (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 821; S.Rep. No. 184, 95th Cong., 1st Sess. (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 843. As we have noted, however, GAO decisions support the proposition that responsibility factors may be considered in the course of proposal evaluation without referral to SBA. *See Anderson Engineering & Testing Co., supra; H.R. Ritchey,* B–205602, July 7, 1982, 82–2 CPD ¶ 28; *Electrospace Systems, Inc.,* B–192574, Apr. 13, 1979, 79–1 CPD ¶ 264, 58 Comp.Gen. 416 (1979). We agree with that assessment, and find no basis for excluding from its generality financial factors where they are reasonably relevant to the proposal in hand. Courts are not without power to restrain patent abuse of this authority. If further protections for small businesses are desired, it is for Congress, and not for us, to provide them.

Our holding that financial factors could properly be considered in evaluating this proposal does not yet establish that the FBI acted properly. The Federal Procurement Regulations specifically require that, after receipt of initial proposals, discussions be conducted with all responsible offerors, unless special conditions exist which make this unnecessary. 41 C.F.R. § 1–3.-805–1(a). Even in those procurements in which it would otherwise be acceptable to omit discussions, "the contracting officer shall not make award without further exploration and discussion prior to award," if "there is uncertainty as to the pricing or technical aspects of any proposals." *Id.* at § 1–3.805–1(a)(5). Since the FBI chose to make Delta Data's financial condition one of the technical evaluation criteria, we think this provision fully applicable.

 Delta Data contests virtually every point of the FBI's interpretation of its financial data. We need not decide whether the FBI's conclusions were correct or even reasonable, because in our view the FBI's failure to give Delta Data an opportunity to refute the negative inferences it drew from the information was, under the circumstances of this case, a violation of the regulations. The regulations do not specify exactly when discussions are to be held, and undoubtedly the decision to hold further discussions or to proceed without them is largely a matter for agency discretion. An agency is not required to go back to the offeror every time a new piece of information comes to its attention. When, however, the new information is of uncertain import, is likely to determine the award, and is of such a nature that the offeror is likely to be able to make a significant contribution to its interpretation, it is an abuse of discretion for the agency to act on the basis of the information without giving the offeror an opportunity to discuss it. Because the FBI erred in this regard, and because that error does not appear to have been harmless, we conclude that the district court was correct in its conclusion that award of the contract to SDC was unlawful. Finding invalidity on this ground, we need not reach Delta Data's further contention that SDC's proposal failed to meet the mandatory specifications of the RFP.

### III

We turn next to the remedy that the district court provided: an injunction requiring cancellation of the contract with SDC and its award to Delta Data. In assessing the FBI's challenge to this relief, we must have prominently in mind "the discretion that is typically accorded officials in the procurement agencies by statutes and regulations." *M. Steinthal & Co. v. Seamans, supra,* 455 F.2d at 1301. Judges are "ill-equipped to settle the delicate questions involved in procurement decisions, where long and complex factual histories, subtle economic factors, and the need for expeditious buying decisions require assessments 'better left to the expertise of an executive agency ....'" *Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1271 (5th Cir.1978) (citation omitted). This is an area in which the Supreme Court's "caution to 'reviewing courts against ... improperly intrud[ing] into the agency's decisionmaking process' ... has

special force." *Id.* at 1270, *quoting Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 525, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978).

▇▇▇ The court's role in reviewing agency contract decisions is limited to determining whether the agency acted in accord with applicable statutes and regulations and had a rational basis for its decisions. *See Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973); *M. Steinthal & Co. v. Seamans, supra*, 455 F.2d at 1301. "It is undisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties." *Scanwell Laboratories, Inc. v. Shaffer, supra*, 424 F.2d at 869, *quoted with approval in National Federation of Federal Employees v. Devine*, 679 F.2d 907, 915 (D.C.Cir.1981); *see also International Graphics v. United States*, 4 Cl.Ct. 186, 193 (1983) (dictum). It follows that a court may not order the award of a contract unless it is clear that, but for the illegal behavior of the agency, the contract would have been awarded to the party asking the court to order the award.[4] Where "[t]here is nothing in the record to guarantee that [the plaintiff] would have received the ... contracts had it received the notice to which it was entitled[, t]here are ... no grounds ... to vacate the awards of those contracts to other contractors and grant them to [the plaintiff]." *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953, 969 (D.C.Cir.1980).

▇▇▇ Although the district court did not explicitly acknowledge this principle, its decision appears to have been based on its finding that without comparative evaluation of financial information "Delta Data would have received the highest overall score and *would have been the winning*

offeror." *Delta Data Systems Corp. v. Webster, supra*, at 358 (emphasis added). Since we have held, however, that such comparative evaluation was not improper, and that the invalidity here consisted only of the failure to permit Delta Data to refute information central to that evaluation, we cannot conclude that even the Technical Evaluation Committee's rankings would have favored Delta Data unless and until we know it would have been arbitrary and capricious to decline to give Delta Data's refutation controlling effect. We have no basis, of course, for making that judgment. Moreover, even if we concede that point, it still leaves us only with the certitude that the *Technical Evaluation Committee* would have selected Delta Data. Unlike that Committee, neither the Contracting Officer nor the Review Board had adopted or approved any point rankings *sans* financial factors—so even assuming that their decision had to be based rigidly upon the point-ranking system set forth in the RFP (*but see Intermountain Research*, B–209827, July 21, 1983, 83–2 CPD ¶ 103) we have no way of knowing what points *they* would have assigned if they had not adopted the Technical Evaluation Committee's flawed recommendation. Appellee would have us assume that the Contracting Officer and Review Board would have approved the Committee's *pre*-financial-factor rankings, just as it approved their *post* rankings. We cannot indulge such an assumption. In any negotiated procurement, the Contracting Officer is free to disagree with the scoring proposed, *see RCA Service Co.*, B–208871, Aug. 22, 1983, 83–2 CPD ¶ 221; A. GALLAGHER, *supra*, at 265, and the parties have stipulated that the Contract Review Board has *de novo* review authority over major FBI procurements. Such superior decision-making authorities "are not bound by the

---

4. It is important to note that the authority to order the award of a contract is not the authority to require its specific performance. Even where the former authority exists, as noted by Judge Friendly: "[A]n action seeking specific performance of a contract with the government may not be brought in a district court to avoid

the Tucker Act's limitation of relief to money judgments." *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 727–28 (2d Cir.1983). *See, e.g., Sea-Land Service, Inc. v. Brown*, 600 F.2d 429, 432–33 (3d Cir.1979). The relief we afford in this case takes that distinction into account.

recommendations made by evaluation and advisory groups ... even though it is the working level procurement officials and evaluation panel members who may normally be expected to have the technical expertise relevant to the technical evaluation of proposals." *Grey Advertising, Inc.*, B–184825, 55 Comp.Gen. 1113, 1120 (1976).

The broad discretion left to the Government after the first technical evaluation distinguishes this case from *Superior Oil Co. v. Udall*, 409 F.2d 1115 (D.C.Cir.1969), the case on which appellees rely most heavily in their argument that the district court properly awarded them the contract. *Superior Oil* ordered an oil and gas lease on public lands awarded to Superior Oil, the second highest bidder, after setting aside the Secretary of the Interior's unlawful award to the highest bidder whose bid was not signed as the regulations required. Delta Data argues that Superior Oil could not demonstrate that it would certainly have won the lease, since the Secretary might have decided not to accept any bid. This shows, according to Delta Data, that courts may properly order the award of a contract even when the agency retains discretion in the matter of its award. We disagree. Chief Justice (then Judge) Burger's opinion in *Superior Oil* acknowledged that the Secretary had discretion in the granting of leases and could reject all bids on grounds that none was in the public interest. It went on to note, however, that this "was a decision [the Secretary] was obliged to make at the time, not as an afterthought with the result that Union and other bidders would have 'another bite at the apple.'" 409 F.2d at 1121. When the Secretary did not make such a decision in timely fashion, he waived his right to make it and thereafter retained no discretion. Thus, the court was able explicitly to find that had the highest bidder not entered the competition, Superior "would have been awarded th[e] lease." *Id.* No such finding can be made in this case.

The only other appellate decision of this circuit cited by Delta Data in support of the proposition that courts can order award of a contract to which the plaintiff has not clearly established its right is this court's summary affirmance of *Air Terminal Services, Inc. v. Department of Transportation*, 400 F.Supp. 1029 (D.D.C.1973), *aff'd*, 515 F.2d 1014 (D.C.Cir.1975). In that case the Department of Transportation, without any formal responsibility determination, first postponed an award and then cancelled its RFP and issued a new one because of allegations that the leading bidder for an airport food services contract was connected to companies with a bad record. The district court ordered an award to the plaintiff under the original RFP. The district court went on, however, to allow the Department of Transportation to set a hearing to consider the responsibility issue and to hold in abeyance bids under the new RFP until plaintiff's responsibility was determined. 400 F.Supp. at 1033. To some extent, then, the court left the final decision to the agency. It did, nonetheless, order the agency to award the contract to Air Terminal Services if it found that bidder responsible. To the extent that our affirmance of *Air Terminal Services* conflicts with *Old Dominion Dairy Products, supra*, we prefer to follow the more recent and more carefully considered case.

Our conclusion that Delta Data was not entitled to the contract would not be altered even if the invalidity of the award were based upon the ground (which we have not reached) of SDC's technical noncompliance with the RFP. It would have been a possible response to that noncompliance—and a reasonable response, given the apparent attractiveness of the SDC proposal—for the FBI to modify the solicitation to take the desirable features into account. The regulations explicitly envision such a modification: "[W]hen the proposal most advantageous to the Government involves a material departure from the stated requirements, consideration shall be given to offering the other firms which submitted proposals an opportunity to submit new proposals on a technical basis which is comparable to that of the most advantageous proposal." 41 C.F.R. § 1–3.805–1(a)(5).

*See also* 41 C.F.R. § 1–3.805–1(d); A. GALLAGHER, *supra,* at 295–98. Consequently, even if at the end of the technical evaluation Delta Data was in fact the only responsive bidder, it still could not establish that it had a right to the contract. Nor, in the case of a complex negotiated contract such as this, do we think that an erroneous award to a noncomplying bidder terminates the power to revise the solicitation. If we were to allow the district court to order an award on the grounds that the only responsive bid had a right to the contract, we would in effect be allowing the court to decide what equipment would best serve the FBI's needs.

## IV

For the reasons set forth above, we conclude that the district court exceeded its authority in ordering award of the contract to Delta Data and we vacate its injunction. There remains the task of fashioning an appropriate alternative remedy. If the vindication of "rights" belonging to Delta Data were the principal object, the ideal remedy would give Delta Data its "expectation" damages—that is, place it in the economic situation it would have occupied if the FBI had not acted improperly. The problem is that we have no way of knowing what that economic situation would have been. All we know for sure is that Delta Data was deprived of an *opportunity* to obtain an award; it might not have received the award even if the FBI had acted properly. Moreover, it is difficult to give Delta Data a new chance at the award, under the same conditions that should have obtained previously. Considerable performance has already taken place under the SDC contract, and even with the best of intentions it will be hard for the FBI to approach a reevaluation of the proposals with the same impartiality it would originally have applied, now that it knows that making the award to Delta Data may involve shifting systems in mid-project and perhaps incurring some liability for termination to SDC.[5]

In any case, this is not merely a private contract but one for the procurement of goods and services by the federal government. The award procedures established by legislation and regulation for that purpose are not designed to establish private "entitlements" to public business, but rather to produce the best possible contracts for the government in the majority of cases. *See Perkins v. Lukens Steel Co.,* 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940); *Friend v. Lee,* 221 F.2d 96, 100 (D.C.Cir.1955). This principle was not changed by the landmark case in which this court recognized the standing of private plaintiffs to sue for violation of procurement laws. As Judge Tamm expressed the theory of such suit:

> [T]he essential thrust of appellant's claim on the merits is to satisfy the public interest in having agencies follow the regulations which control government contracting. The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a "private attorney general."

*Scanwell Laboratories, Inc. v. Shaffer, supra,* 424 F.2d at 864. Thus, the main objective of our effort at framing a remedy is to assure that the government obtains the most advantageous contracts by complying with the procedures which Congress and applicable regulations have provided. Putting the disappointed bidder in the economic position it would have occupied but for

5. With regard to the other alleged award violation which we have not ruled upon—the asserted noncompliance of SDC's proposal—it would be even more difficult to recreate the situation that should have obtained. Delta Data would have to be allowed to submit a bid under the assertedly more permissive technological standards SDC was allowed. But there is no way that that bid could be (as it was originally supposed to be) "blind," since Delta Data is now aware of both the technological and pricing aspects of SDC's offer. Equity would be done to Delta Data only at the expense of inequity to SDC.

the error is normally the best approach to this result. Where that is impracticable, however, or can only be achieved at a cost to the government that will greatly exceed the benefits derived from requiring observance of the proper procedures in the particular case, we must seek a more reasonable alternative.

What we said in *Old Dominion Dairy Products, Inc. v. Secretary of Defense, supra,* 631 F.2d at 969, is equally applicable here:

> In a case such as the present one, it is difficult several months after the occurrence giving rise to litigation to fashion relief. Often past events cannot be reconstructed and, as a result, the injury complained of cannot be adequately corrected. Unfortunately, in this case, the injury was easier to avoid than it is to correct.

In that case, we did not even require reconsideration of the past award. Because the contract in the present case is of considerably longer duration and of much greater value, we are prepared to go somewhat further to enforce the regularity of award procedures. We believe that the interests of justice and the needs of the FBI will best be served by giving Delta Data the right to require the FBI to make a *nunc pro tunc* reselection of contractor under Solicitation No. 2591 on the basis of the best final offers previously submitted. In making such reselection, the FBI may consider, as part of the responsiveness determination, the financial data that was before it on the selection date; but it shall provide Delta Data an opportunity to discuss those data and to refute any adverse inferences with other data which were then in existence. If Delta Data is selected, the FBI shall award the contract to Delta Data. If the FBI decides not to honor that contract but to proceed with its arrangements with SDC, *see* note 4, *supra,* Delta Data may thereupon pursue its appropriate remedies under the Tucker Act, 28 U.S.C. § 1491 (1982).

Since we recognize, however, that this— the closest approximation to a recreation of the situation that should have obtained— may not realistically give Delta Data its original expectations, we further acknowledge Delta Data's option, if it so desires, of obtaining its reliance costs *instead of* its expectations. That is to say, if Delta Data does not request a reselection determination, the district court may consider awarding bid preparation costs to Delta Data if Delta Data requests less than $10,000. *See Keco Industries, Inc. v. United States,* 428 F.2d 1233, 1240 (Ct.Cl.1970). If Delta Data requests bid preparation costs of $10,000 or more, the district court shall transfer the case to the Claims Court under 28 U.S.C. § 1631 (1982).

Our order of July 16, 1984 is modified to conform to this opinion.

*So ordered.*