ELCON ENTERPRISES, INC., Plaintiff,

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY and Schindler Elevator Corporation, Defendants.

Civ. A. No. 89–3410–SSH.

United States District Court, District of Columbia.

May 31, 1991.

Michelle L. Gilbert, David B. Dempsey, Joseph F. Cunningham, Washington, D.C., for plaintiff.

Frank R. Filiatreau, Jr., Asst. Gen. Counsel, Washington, D.C., for WMATA.

Frederick V. Lyon, S. Scott Morrison, Julie A. Guagliano, Washington, D.C., for Schindler Elevator Corp. and Westinghouse Elevator Co.

## OPINION

STANLEY S. HARRIS, District Judge.

Now before the Court are the Washington Metropolitan Area Transit Authority's (WMATA's) motion for summary judgment and the cross-motions for summary judgment filed by plaintiff Elcon Enterprises, Inc., and defendant Schindler Elevator Corporation.[1] For the reasons set forth below, defendants' motions are denied and plaintiff's motion is granted, with limited relief.

### Background [2]

In April 1989, WMATA issued RFP–N–47886, requesting proposals for a three-year contract to maintain the 460 escala-

---

1. Plaintiff originally filed the action against, in addition to WMATA, Schindler Corporation and Westinghouse Elevator Company. By the February 13, 1990, Order of the Court, defendant Schindler Elevator Corporation was substituted as successor-in-interest to Westinghouse, a division of Schindler Corporation.

2. WMATA filed a motion to strike plaintiff's counterstatement of facts in opposition to WMATA's motion for summary judgment, alleging that plaintiff's counterstatement was argumentative and contained assertions either not at issue or not in the record. Although the Court will not strike the counterstatement, the Court does note that all of the parties, in varying degrees, were guilty of distorting or excluding facts from the record, making it difficult for the Court to ascertain which facts are not at issue.

tors in its Metrorail system (Metro).[3] WMATA procurement regulations require that services of this type be procured by competitive negotiation, and that award "be made to that responsible proposer whose proposal is most advantageous to the Authority, price, technical and other factors considered."[4] Specifically, the regulations provide, in relevant part:

### 7. RESPONSIBLE PROSPECTIVE CONTRACTORS

a. *General Policy.* Contracts shall be awarded only to responsible prospective contractors who possess the capability to successfully perform a proposed contract. Consideration shall be given to integrity, record of past performance, availability of necessary financial and technical resources, and other relevant matters.

g. *Determinations of Responsibility or Non–Responsibility*

No contract shall be awarded to any person or firm unless the Contracting Officer first makes an affirmative determination that the prospective contractor is responsible.... If a Contracting Officer has doubts about the productive capacity or financial strength of a prospective contractor which cannot be resolved affirmatively, he or she will determine that the prospective contractor is nonresponsible. A determination and findings supporting the determination will be prepared and placed in the contract file.

### 12. SELECTION OF CONTRACTOR.

Upon the conclusion of discussions and after the review of "best and final offers", the Contracting Officer shall select that offeror whose proposal he determines to be most advantageous to

the Authority, price and all other factors considered....

### 14. APPROVAL OF AWARD.

When an offeror is selected for award, the Contracting Officer will request approval of the award by preparing WMATA Form "Action No. 2, Request for Approval of Award" in accordance with Section 15, Chapter I. All necessary concurrences, including General Counsel, shall be obtained.

In addition, a contract for an amount in excess of $100,000.00 requires final approval by WMATA's Board of Directors.

The Request for Proposal (RFP) stated that the "procurement would be conducted utilizing the procedures of competitive negotiation of technical and price proposals." Under the heading "INSTRUCTIONS TO PROPOSERS," the following relevant provisions were set forth:

9. *Negotiations.* After receipt of initial proposals, written or oral discussions may be conducted with all responsible proposers. Factors (including technical quality) will be considered to the extent necessary to resolve uncertainties relating to the technical requirements. Basic questions will not be left for later agreement during supplemental proceedings. When negotiations are conducted with more than one proposer, the relative price positions shall not be revealed. If negotiations are conducted with several proposers whether successively or not, all proposers selected to participate in negotiations will be offered an equal opportunity to submit revisions as required. Complete agreement on all basic requirements shall be the objective of these negotiations.

---

**3.** WMATA is an agency and instrumentality of the State of Maryland, the Commonwealth of Virginia, and the District of Columbia, created by and pursuant to an interstate compact between these jurisdictions, authorized and consented to by Congress. Metro is the primary mode of transportation for residents and tourists in the Washington metropolitan area. On an average weekday, Metro carries nearly one half million passengers. The escalators are the primary source of vertical transportation in the Metro system. The system also has some stair-

ways, as well as 128 elevators to transport handicapped passengers. A passenger rides an average of three to four escalators each time he or she uses Metro. Thus, the escalators carry up to 1.5 to 2 million passengers per day. The Metro escalator system is one of the largest in the country, involving a highly modern, complex, and unique technology.

**4.** The Compact itself makes no provision as to how services are to be procured.

10. *Best and Final Offer.* Upon conclusion of negotiations, all responsible proposers will be informed of the specified time and date to submit their Best and Final Offer. The Best and Final Offer shall be each contractor's most favorable price proposal for the technical proposal which had been clarified and agreed to during negotiations.

11. *Proposal Evaluation.* Initially technical proposals will be evaluated based on material submitted in response to Paragraph 23, page RFP–9, entitled "TECHNICAL PROVISIONS REQUIREMENTS". Upon determination that the proposer meets the minimum requirements of Paragraph 23, successful proposal will be evaluated based on the factors specified in Paragraph 25, EVALUATION CRITERIA. The relative weight of importance of various items listed in the requirements has been pre-determined by a numerical scoring method and is known only by the Authority. On the basis of these submissions and their weight, the technical proposal will be scored on the established scale. The business/cost proposal will be evaluated based on the material submitted in response to Paragraph 24, page RFP–9 and 10, entitled "BUSINESS/COST PROPOSAL REQUIREMENTS." The proposal will be reviewed on the basis of all proposers being technically acceptable. Essentially, business/cost proposal will be evaluated on the amount, depth and utility of the information supplied to determine which proposal presents the most favorable overall cost parameters.

The Authority's award decision shall be based on the most favorable combination of technical score and total price.

12. *Basis for Award.* The contract shall be awarded to that proposer submitting the most favorable technical and business/cost proposal as determined through the evaluation procedures established for this procurement. Cost will be a factor in the award decision, although the award may not necessarily be made to that proposer submitting the lowest total price. Likewise, award will not necessarily be made for technical capabilities that would appear to exceed that needed for successful performance of the work.

13. *Award of Contract.* The Authority reserves the right to reject any or all proposals at any time prior to award; to negotiate with any or all proposers; to award a contract to that responsive, responsible proposer whose proposal conforming to this Request for Proposal, is most advantageous to the Authority, all factors considered. Technical proposal will be carefully evaluated to determine the proposer's capability to perform this contract. Proposers are advised that award may be made without discussion or any contact with the proposers concerning the proposals received. Therefore, proposals should be submitted initially on the most favorable terms that a proposer can submit to the Authority.

21. *Disadvantaged Business Enterprise.*

f. Offeror must demonstrate a specific plan to achieve a minimum DBE participation goal of 36% of the total contract expenditures. The Offeror's overall plan for DBE participation will be evaluated both as to the likelihood of meeting or exceeding the aforementioned minimum goals and regarding consistency with efficient performance of the contract.

Appendix B to the RFP set forth the requirements for meeting the 36% DBE goal. In the absence of achieving the 36% goal, a proposer could request a waiver of the goal by submitting documentation showing a good faith effort to achieve it. A proposer who failed to supply the requisite documentation or request for a waiver would be deemed a nonresponsive bidder and would not be eligible for award of the contract.

In June 1989, WMATA received initial proposals from Elcon, Westinghouse, and

National Elevator Company.[5] In accordance with the procurement regulations and the terms of the RFP, a technical review team and a business/cost review team were appointed to evaluate the proposals from the three contractors. The technical review team members, all experienced in escalator maintenance, initially evaluated the proposals on the basis of preliminary criteria.[6] Once a determination was made that a proposer satisfied the preliminary criteria, the team members individually scored each proposal in accordance with a memorandum issued by the Director of the Office of Procurement which set forth the maximum scores available for each evaluation criterion.[7] They did not discuss their respective scores with anyone else on the team. In addition, they were instructed not to discuss the technical proposals with anyone on the business/cost team, in order to ensure that they would not be influenced by information obtained by the other team. The team members then submitted the individual scores to the Chairman of the team, who then averaged the individual scores and determined a composite score.

After the proposals were evaluated initially, Elcon received a composite score of 50, the highest score possible, for its technical proposal. Westinghouse received a score of 49.2.[8] The scores, together with a written explanation of how the team arrived at the scores, were forwarded to the Office of Procurement. After receiving the scores, officials from the Office of Procurement called a meeting with the Chairman and Vice Chairman of the technical team. At the meeting, Charles Stalzer, WMATA's Supervisor of the Equipment Supply and Services Section, questioned how it could be that the incumbent Westinghouse, with its staff and experience, would not receive a higher score than a competing proposer.[9] Stalzer asked the technical team members to reevaluate their proposals based on his comments.

The technical team members rescored their proposals, with Westinghouse receiving a composite score of 46.5 points and

5. Westinghouse had maintained the escalators since their installation began in February 1972.

6. Under the preliminary criteria, the proposer must:

    a. Have demonstrated and documented successful experience in escalator maintenance.
    b. Be thoroughly familiar with the operation, repair, and maintenance of escalators.
    c. Demonstrate sufficient equipment and manpower resources to perform this program.
    d. Have the capability to obtain and store spare parts.

7. The criteria on which the proposers were evaluated were as follows:

    a. General Quality and Responsiveness of Proposal (Total Weight of 21 Points)
    (1) Understanding Project: Proposer must submit a proposal that is responsive and achievable. (6 points)
    (2) Comprehensiveness of Proposal. (5 points)
    (3) Sample outline of how the work is to be performed. (4 points)
    (4) The ability to provide spare parts of the same manufacturer or spare parts substantiated by engineering documentation as equal. (3 points)
    (5) Proposers must have a satisfactory record of providing the required services to large metropolitan transit authorities. (3 points)
    b. Organization and Personnel (Total Weight of 19 Points)
    (1) The organization and staff capacity to currently comply with the contract requirements. (13 points)
    (2) Quality of personnel assigned. (6 points)
    (a) Administrative and management personnel.
    (b) Documented qualifications and experience of maintenance personnel.
    c. Previously [*sic*] Experience of Proposing Firm (Total weight of 10 Points)
    d. Minority Participation (Yes or No).

8. The scores and evaluations of National Elevator Company are not relevant for purposes of the matter before the Court and will not be dealt with here.

9. The largest number of escalators Elcon had maintained, combining all of its contracts at one time, was less than twenty. The sum total of experience in the maintenance of escalators for Elcon's designated project manager for the contract was six or seven months in the 1960's. Resumes of Elcon's proposed managerial and maintenance personnel indicated minimal experience with escalators. However, individuals with elevator experience also have been trained in and are familiar with escalator maintenance.

Elcon receiving 44 points. In reevaluating the proposals, most of the team members eliminated all of Elcon's points for past experience on a large transit system comparable to the WMATA system.[10]

In its proposal, Elcon submitted information indicating that it had met the 36% DBE goal through the hiring of Barbee–Curran Elevator Company.[11] Because Westinghouse's proposal showed 2.6% DBE participation, Westinghouse requested a waiver of the goal to the extent of 33.4%.[12]

On August 3 and August 4, 1989, both the cost and technical review teams reported the results of their review of the initial proposals and discussions with the proposers to the Contracting Officer. The cost review team reported that Elcon submitted a one-year cost proposal in the amount of $8,983,588.00 and that it had adequate financial capability subject to its receiving financing from its bank. The team also noted that although Elcon had met the 36% DBE goal, the proposed DBE had not been certified by WMATA.[13] The cost review team reported that Westinghouse submitted a cost proposal in the amount of $9,099,029.00. It noted that Westinghouse had submitted a proposal of only 2.6% DBE participation and had been urged to increase the participation. Both teams recommended that Westinghouse be awarded the contract.

After discussions with each offeror, best and final offers were submitted on August 17, 1991. Westinghouse received a total of 85.7 points, while Elcon received 83 points. After the offers were received, WMATA's Office of Civil Rights took the position that Westinghouse had not made a good faith effort to comply with the DBE requirements. Thus, that Office concluded that it "[could not] concur in the award of this contract to Westinghouse unless there [was] a demonstrated concerted effort to involve DBEs in a meaningful way in this procurement."

After reviewing the evaluations, the Contracting Officer determined that Elcon and Westinghouse had submitted substantially equal proposals and that Elcon should be awarded the contract as the lower-priced proposer.[14] As of October 2, 1989, senior WMATA officials, including the Comptroller, the General Counsel, and the General Manager, approved award of the contract to Elcon and submitted a request for approval of the award to the Board of Directors. This constituted a staff recommendation to the Board.

On October 2, 1989, James Iannacone, Transit Manager for Westinghouse, telephoned Harold Rose, a member of the technical review panel, and informed him that Westinghouse had been called in by Washington National Airport to perform maintenance on some escalators for which Elcon was under contract to maintain.[15] Ianna-

**10.** In the initial evaluations, the technical team members had not literally construed this factor, reasoning that the WMATA system is the largest in the nation and that only Westinghouse had been under contract to maintain it. They initially gave Elcon credit for its experience in handling a number of smaller contracts.

**11.** Barbee–Curran is the largest woman-owned elevator/escalator maintenance business in the area. Westinghouse did not contact Barbee–Curran, although it had in a previous year and had been told that the company was not interested.

There are few experienced escalator maintenance contractors that are qualified DBEs. According to Elcon's project manager, Barbee–Curran was "the only game in town." That company was the only one he wanted to involve in the contract, and he could name only three others: one that is now defunct, one that he did not trust, and one that Elcon had never worked with.

**12.** There is some discrepancy in the documentation as to whether Westinghouse proposed 2.2% or 2.6% DBE participation. The parties seem to have accepted the 2.6% figure and it will be used by the Court for consistency.

**13.** The proposed DBE, Barbee–Curran, subsequently was certified by WMATA on November 27, 1989.

**14.** Because he recommended awarding the contract to Elcon, the Contracting Officer did not further consider the comments by the Office of Civil Rights as to its determination that Westinghouse had not made a good faith effort to meet the DBE requirement.

**15.** Elcon maintains that someone at WMATA had to have been leaking information to Westinghouse about the status of the award, although that is unsubstantiated. Westinghouse claims that an employee of Elcon informed an

cone's understanding was that National Airport was dissatisfied with Elcon's performance. By letter dated October 4, 1989, Iannacone contacted the Chairman of WMATA's Board of Directors and provided him with the same information.[16]

Elcon's proposal was presented to the Board of Directors. At its October 5, 1989, Executive Session, the Board was informed that Westinghouse intended to delay signing another contract until after the Board took action on the maintenance contract.[17] The Board also was informed that Westinghouse might challenge the constitutionality of the DBE requirement if the contract were awarded to Elcon. In addition, the Board received a letter from Westinghouse regarding Elcon's performance on the National Airport contract. The Board raised questions about Elcon's ability to perform the maintenance contract and directed the staff to conduct a further review of Elcon's ability to perform the contract, as well as of Westinghouse's effort to obtain greater DBE participation.

On October 6, 1989, certain WMATA officials held a meeting with Elcon officials. Elcon responded to WMATA's questions by stating that there had been no problems with their maintenance of the escalators at National Airport and that Westinghouse had been called in for liability reasons only. Elcon also explained its proposed staffing of mechanics for the project. In addition, WMATA received a letter dated October 11, 1989, from the contracting officer of the Metropolitan Washington Airports Authority stating that there was nothing in the contract file that would indicate that Elcon's performance was less than satisfactory. At the conclusion of the further investigation, the staff concluded that Elcon was competent to perform the contract.

On October 11, 1989, Westinghouse filed a contingent protest which would go into effect only if it were not awarded the contract. In its protest, Westinghouse questioned Elcon's ability to perform the contract. A briefing on Westinghouse's contingent protest was presented to the Board of Directors at its October 12, 1989, Executive Session.

On October 26, 1989, counsel for Elcon wrote a letter to the Contracting Officer, stating that Elcon was concerned that WMATA was "attempting to improperly disqualify Elcon Enterprises and his [*sic*] maneuvering Schindler Westinghouse Elevator Co. ("Schindler"), into a sole source contract." Counsel stated that it would consider a waiver of the DBE requirement for Westinghouse "to be contrary to WMATA's self-proclaimed policy in supporting Washington metropolitan area DBEs." Counsel requested a meeting with WMATA officials, as well as a written explanation as to why it had taken WMATA over two months to award the contract. On November 2, 1989, counsel wrote a letter to WMATA's General Manager, again voicing Elcon's concern that WMATA would grant a waiver to Westinghouse. Counsel indicated that unless Elcon received satisfactory answers to the questions it raised, they would recommend filing a protest with WMATA or in federal court.

On November 7, 1989, the Board requested that Elcon and Westinghouse submit new best and final offers. Elcon was asked to address further its capability to perform the contract, while Westinghouse was asked to address its DBE participation. Officials at WMATA met with Elcon officials on November 16, 1989, and with West-

employee of Westinghouse that WMATA officials would recommend awarding the contract to Westinghouse. Elcon counters by stating that none of its employees knew anything about it. Although this is an issue of fact, it is not material, and neither version would change the Court's ultimate conclusion.

16. In May 1989, the Contracting Authority for the Airport Authority had told a WMATA official that Elcon's performance on the contract had been very good and that all work had been completed on time.

17. The other contract was the Escalator Fabrication and Installation Contract No. 1Z6050. The Notice of Award, Notice to Proceed, and Transmittal of Contractual Documents letter was sent to Westinghouse on October 16, 1989, and signed as received by Westinghouse on October 25, 1989.

inghouse officials on November 17, 1989.[18] On November 20, 1989, counsel for Elcon wrote to WMATA's General Manager and enclosed a memorandum expressing concerns about alleged improprieties in the procurement process. The revised best and final offers were submitted on November 27, 1989. Elcon's revised best and final offer included two additional personnel, one with financial and one with elevator experience, and proposed a lower price.[19] Westinghouse's revised best and final offer reaffirmed its price, increased its DBE participation from 2.6% to 10.3%, and requested a waiver of 25.7% of its DBE participation.

The WMATA Board appointed an ad hoc panel to review the revised offers and engage in discussions with Elcon and Westinghouse. The panel was composed of Edwin Keiser, WMATA's Deputy Assistant Manager, Department of Design, Construction, and Facilities Maintenance; Claude Swanson, WMATA's Director of the Office of Civil Rights; and Edward Rhodes, WMATA's Director of Procurement and the Contracting Officer for the contract. The panel was instructed to consider concerns about Elcon's qualifications and Westinghouse's request for a partial waiver of the DBE requirement. After discussions with Elcon and Westinghouse, on December 6, 1989, the ad hoc panel submitted a memorandum report to the General Manager recommending that the contract be awarded to Westinghouse.

The report listed concerns about Elcon's ability to perform the contract. Specifically, the panel found that Elcon had not demonstrated its capability to carry out a contract of that size, and that "WMATA would risk a degradation in service and safety while Elcon acquired on-the-job experience." The panel noted that Elcon's largest related project had a value of $520,-000.00 and that the largest number of escalators maintained under any of its contracts had been eight at the D.C. Convention Center and six at National Airport. It listed concerns about Elcon's ability to supervise and manage the sizeable contract, particularly in light of the lack of escalator experience of Elcon's proposed supervisory personnel, and about Elcon's ability to perform with the 98% availability and two-hour response time requirements. In addition, the panel found that the Technical Review Panel had not given adequate weight to "questions about the contractor's ability to rapidly expand its operations to accommodate a contract of this magnitude." The panel did not rescore the proposals, as "it did not consider its mission to be to completely rescore the technical proposals." Rather, the panel focused on the concerns that had been raised by the Board. If it had rescored the proposals, Elcon would have received the higher score, due to its reduced cost proposal.

The panel also found that by increasing its proposed DBE participation from 2.6% to 10.3%, Westinghouse had made a good faith effort to meet the 36% goal. The panel noted that just prior to the submission of WMATA's first best and final offer, one of its DBE's had been decertified.[20]

On December 7, 1989, the panel's recommendations were submitted to the WMATA Board of Directors. On the same date, counsel for Elcon sent a letter to WMATA's General Manager, again addressing Westinghouse's failure to meet the 36% DBE requirement. The letter asked that Elcon be awarded the contract without further delay and warned that if WMATA continued to consider Westinghouse's proposal, Elcon would have no choice but to file suit. On December 14, 1989, the Board formally approved the award of the contract to Westinghouse. Plaintiff commenced this action on December 20, 1989, and filed a motion for a temporary restrain-

---

**18.** At the Westinghouse meeting, Iannacone informed WMATA that because of concerns for liability and safety, including public safety, the company limits subcontracting to work other than its actual work on the maintenance of the escalators.

**19.** Elcon's President arbitrarily reduced the price because he believed Elcon was in a "panic situation" with respect to the award of the contract.

**20.** The DBE, RTN, Inc., had been decertified in February 1989. However, RTN was appealing its decertification.

ing order. Following a hearing on March 29, 1990, the Court denied plaintiff's motion on March 30, 1990.

### Discussion

"The court's role in reviewing agency contract decisions is limited to determining whether the agency acted in accord with applicable statutes and regulations and had a rational basis for its decisions." *Delta Data Systems Corp. v. Webster*, 744 F.2d 197, 204 (D.C.Cir.1984) (citations omitted). " 'It is undisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties.' " *Id.* (quoting *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 869 (D.C.Cir.1970)). Plaintiff argues both that WMATA's decision to award the contract to Westinghouse lacked a rational basis and that WMATA failed to follow its procurement regulations.

■ Turning first to the question of whether WMATA's decision to award the escalator maintenance contract to Westinghouse had a rational basis, the Court concludes that it did. The facts speak for themselves. Westinghouse, the incumbent, has extensive experience in maintaining WMATA's escalators and solid financing. Although Elcon received a higher score than Westinghouse in the initial evaluation by the technical team, the difference was minimal. The revised evaluation by the technical team gave Westinghouse a higher score, and the evaluating teams ultimately recommended awarding the contract to Westinghouse. The Contracting Officer acknowledged that the proposals were close and recommended awarding the contract to Elcon because its cost proposal was lower. The Board of Director's concerns about Elcon's ability to perform the substantial contract were certainly rational. The decision to grant Westinghouse a waiver of 25.7% of the DBE requirement based on a showing of good faith in attempting to meet the 36% goal also had a rational basis.

The public interest in Metro escalator maintenance is great, as WMATA well understands. Under such circumstances, where the two contractors received scores that were quite close, the fact that WMATA ultimately chose the more experienced contractor over the lower-priced but less experienced contractor cannot be said to be irrational.

Plaintiff further argues that WMATA violated its own regulations in several ways: (1) by reversing the original technical team recommendation, (2) by the Board of Directors' ordering their staff to conduct a review of Elcon's ability to perform the contract and Westinghouse's efforts to comply with the DBE requirement, (3) by the Board of Directors' appointing an ad hoc committee to further review the Board's bases for concern, (4) by never making a written determination of Elcon's nonresponsibility, and (5) by considering Westinghouse for the award even though Westinghouse was ineligible due to its failure to satisfy the DBE requirement at the time it submitted its best and final offer. In addition, plaintiff alleges that the entire procurement process was fraught with pro-incumbent bias. The Court addresses each allegation in turn.

■ First, the Court disagrees with plaintiff's argument that WMATA violated its procurement regulations by reconsidering the technical team's initial evaluation. When the technical team members initially evaluated the proposals, they gave Elcon and Westinghouse the same number of points for having previous experience on a large transit system, even though Westinghouse manifestly was experienced in that area and Elcon was not. When those scores were submitted to the Office of Procurement, a key WMATA official questioned the scoring and asked the team to reevaluate. In essence, the official determined that the team members had not scored the proposals according to their instructions. Thus, it was not improper to request that they do so. In addition, it makes no sense to argue that it is unfair to award points for experience because the WMATA system is the largest in the nation and only Westinghouse has ever been under contract to maintain it. The criteria do not require experience on Metro only or

even on another transit system of its size, because that would be nonexistent. Experience on any large transit system would suffice. More importantly, while fairness to all bidders is of great importance, the object of the procurement process is to get the best contractor for the benefit of Metro riders. By taking into account Westinghouse's extensive experience, WMATA did not violate any regulations.

■ Second, WMATA's Board of Directors did not violate the regulations by ordering its staff to conduct a further inquiry to address the Board's concerns. The Board is obligated to approve all contracts in excess of $100,000.00; the escalator maintenance contract was worth millions of dollars. Although the regulations do not specifically authorize the Board's inquiry, assuredly such an inquiry is permissible. Surely plaintiff does not suggest that the Board is required to rubber stamp recommendations from the Contracting Officer. "Such superior decision-making authorities 'are not bound by the recommendations made by evaluation and advisory groups ... even though it is the working level procurement officials and evaluation panel members who may normally be expected to have the technical expertise relevant to the technical evaluation of proposals.' " *Delta Data Systems,* 744 F.2d at 204–05 (quoting *Grey Advertising, Inc.,* B–184825, 55 Comp.Gen. 1113, 1120 (1976)). It follows then that the Board must be able to direct an inquiry to address its own concerns. In addition, consistent with competitive negotiation, the Board's staff gave both Elcon and WMATA an opportunity to respond to the Board's concerns, so there was no unfairness in that regard. *See Delta Data Systems,* 744 F.2d at 203 (contracting agency must not act on basis of negative information without giving contractor an opportunity to discuss it).

■ Third, the Board of Directors did not violate the procurement regulations by appointing an ad hoc committee to review its concerns. The panel was comprised of experienced WMATA officials who conducted discussions with Elcon and Westinghouse, giving both contractors an opportu-

nity to address the Board's concerns. The fact that plaintiff believes that the concerns had been previously adequately addressed and that the ad hoc committee was unnecessary is irrelevant. In addition, plaintiff's allegations of bias are unsubstantiated. The Board raised its concerns and addressed them in its discretion. The Court will not disturb that decision absent a violation of the regulations or a finding that the decision lacked a rational basis.

■ Fourth, under the unusual circumstances of this procurement, the fact that WMATA did not make a written determination that Elcon was nonresponsible does not constitute a violation of the procurement regulations. Under the regulations, the Contracting Officer has the duty to make a determination of nonresponsibility "if information obtained indicates clearly that the prospective contractor is not responsible." However, in this case, the Contracting Officer initially recommended to the Board that Elcon be awarded the contract; obviously he did not determine that Elcon was nonresponsible. Furthermore, although the ad hoc committee, of which the Contracting Officer was a member, did not make a formal finding of nonresponsibility, it expressed in writing its doubts about Elcon's ability to perform the huge contract, based on the evaluation criteria. "In negotiated procurements such as this, ... as opposed to procurements by formal advertising ..., the line between responsibility factors and proposal evaluation factors is not a sharp one." *Delta Data Systems,* 744 F.2d at 200. In other words, although the Board eventually concluded that Elcon had not shown its ability to execute a contract of that size, it need not have determined that Elcon was nonresponsible. Rather, based on the evaluation criteria, in comparing the two contractors, the Board rationally could have decided against awarding the contract to Elcon.

■ Fifth, Westinghouse was not ineligible for award of the contract because it did not meet the DBE requirement. When Westinghouse submitted its best and final offer, it proposed 2.6% DBE participation and requested a waiver for the remaining

33.4%. After reviewing Westinghouse's offer, the Office of Civil Rights made the determination that Westinghouse had not made a good faith effort to meet the DBE requirement and advised that it could not agree to award the contract to Westinghouse. However, in spite of the Civil Rights Office's recommendation, and assuming *arguendo* that the requirement could survive a constitutional challenge, the Contracting Officer did not determine that Westinghouse had failed to demonstrate a good faith effort. The Contracting Officer simply determined that the two proposals were close and, therefore, that Elcon, as the lowest cost proposer, should be awarded the contract. The issue then was raised by the Board and addressed by its staff and the ad hoc committee. In reversing the Contracting Officer's initial recommendation to the Board, the ad hoc committee determined that Westinghouse had made a good faith effort.

■ The Court notes that some of the steps taken by WMATA in the procurement process were unusual and not necessarily appropriate for future contracts. However, under the circumstances, where the Board has ultimate authority over the award of large contracts and expresses serious doubts about an award so crucial to the public interest, the Court will not overturn a Board's decision to explore the basis for its doubts as long as the process remains fair to the parties. The Board did not hide its doubts, but rather expressed them to the parties and allowed them opportunities to respond. Unfortunately, however, the Board went too far in this regard, as it allowed improper *ex parte* communications with each party.

■ "An important question to be considered by a court when reviewing a negotiated procurement decision is whether the agency breached its duty to consider each offeror's bid fairly and honestly." *Minnesota Mining and Mfg. Co. v. Shultz*, 583 F.Supp. 184, 189 (D.D.C.1984). Between October 2, 1989, and October 12, 1989, Westinghouse communicated with members of the Board that Elcon had been replaced by Westinghouse on an escalator

contract at National Airport, that Westinghouse would not sign an unrelated escalator installation contract until the Board awarded the escalator maintenance contract, and that if not awarded the contract, Westinghouse might challenge the constitutionality of the DBE requirement. In addition, Westinghouse filed a contingent protest with WMATA which was to go into effect if it were not awarded the contract. The Board received a briefing on the protest on October 12, 1989. In addition, between October 26, 1989, and December 7, 1989, Elcon wrote four letters to WMATA officials, expressing concern about the possibility of Westinghouse's being awarded the contract after failing to meet the DBE requirement, expressing concerns about improprieties in the procurement process, and stating that it would file suit if WMATA continued to consider the Westinghouse proposal. The Court is not so concerned about the parties' attempts to point out the insufficiencies in the other's bid; WMATA gave the parties sufficient opportunities to respond to those concerns. However, it is impossible to determine whether the Board was influenced by what amounted to threats by the parties. The fact is that the process was tainted by those communications and, therefore, it must be considered to have been unfair.

■ Having concluded that the procurement process was tainted with impropriety, the Court must determine the appropriate remedy.

> [T]he main objective of our effort at framing a remedy is to assure that [WMATA] obtains the most advantageous contracts by complying with the ... applicable regulations. Putting the disappointed bidder in the economic position it would have occupied but for the error is normally the best approach to this result. Where that is impracticable, however, or can only be achieved at a cost to the government that will greatly exceed the benefits derived from requiring observance of the proper procedures in the particular case, we must seek a more reasonable alternative.

*Delta Data Systems*, 744 F.2d at 206–07.
In a case such as the present one, it is difficult several months after the occur-

rence giving rise to litigation to fashion relief. Often past events cannot be reconstructed and, as a result, the injury complained of cannot be adequately corrected. Unfortunately, in this case, the injury was easier to avoid than it is to correct.

*Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953, 969 (D.C.Cir.1980). Plaintiff asks the Court to vacate WMATA's award to Westinghouse and award the contract to Elcon. However, "a court may not order the award of a contract unless it is clear that, but for the illegal behavior of the agency, the contract would have been awarded to the party asking the court to order the award." *Delta Data Systems,* 744 F.2d at 204 (footnotes omitted). Because the Court has concluded that WMATA had a rational basis for awarding the contract to Westinghouse, the Court cannot determine that WMATA would have awarded the contract to Elcon absent the improprieties set forth above. In addition, Elcon, too, is guilty of attempting to influence the Board through *ex parte* communications and lawsuit threats. Therefore, the Court will not award the contract to Elcon.

It is difficult to give Elcon another opportunity to obtain the award now that Westinghouse has performed the contract for over a year.[21] "[E]ven with the best of intentions it will be hard for [WMATA] to approach a reevaluation of the proposals with the same impartiality it would originally have applied...." *Id.* at 206. However, WMATA is at least partly responsible for the delay in the resolution of this matter through its conduct in the discovery process and should not receive a benefit from the delay. In addition, the Court must consider the practicality and the cost in relation to the benefit of requiring WMATA to reconsider the award. *Id.* at 207.

The Court concludes that the interests of the parties and the public would best be served by giving Elcon the right to require the WMATA Board of Directors to reconsider its decision in light of this Opinion. Because the Court finds that WMATA did not violate the procurement regulations prior to the Board's consideration, no constructive interest would be served by requiring WMATA to start the procurement process from the beginning. If the Board on further evaluation selects Elcon, WMATA shall award the contract to Elcon. If the Board again selects Schindler (formerly Westinghouse), Schindler shall proceed with performance under the contract. Recognizing, however, as the Court did in *Delta Data Systems,* that this remedy "may not realistically give [Elcon] its original expectations," the Court will allow Elcon the option of recovering its bid preparation costs in lieu of the Board's reselection determination. *Id.*

---

**21.** WMATA's motion was filed in January 1990, while Elcon and Schindler filed their motions in May 1990. However, even as they filed their motions, the parties had some unresolved discovery disputes which the Court had referred to a Magistrate. Once the Magistrate ruled, WMATA appealed the decision to the Court, which denied WMATA's request to reverse the Magistrate. WMATA then moved for reconsideration. Once the discovery disputes were resolved, the parties filed supplemental briefs, the last one of which was filed on April 12, 1991. The Court did not think it wise to resolve the case while discovery disputes remained.