ELCON ENTERPRISES,
INC., Appellant,

v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY, et al.

ELCON ENTERPRISES, INC.

v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY, Appellant,
Schindler Elevator Corporation, et al.

ELCON ENTERPRISES, INC.

v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY Schindler
Elevator Corporation, Appellant.

Nos. 91–7106, 91–7107 and 91–7122.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 22, 1992.
Decided Oct. 30, 1992.

Joseph F. Cunningham, Washington, D.C., for appellant Elcon Enterprises, Inc.

Gerard J. Stief, with whom Robert L. Polk, Gen. Counsel, Robert J. Kniaz, Deputy Gen. Counsel, and Francis R. Filiatreau, Jr., Asst. Gen. Counsel, Washington, D.C., were on the brief, for appellee/cross-appellant Washington Metropolitan Area Transit Authority.

V. Frederic Lyon, with whom Julie A. Quagliano, Washington, D.C., was on the brief, for appellee/cross-appellant Schindler Elevator Corp.

Before: WALD, SILBERMAN, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

In this case, we are called upon to decide whether or not the decision of the Washington Metropolitan Area Transit Authority ("WMATA") to award a system-wide escalator maintenance contract to Schindler Elevator Company ("Schindler") should be set aside. We must also decide whether it is proper to award a remedy to a disappointed bidder or proposer, in this case Elcon Enterprises Incorporated ("Elcon"), if the contract award is not irrational or in violation of applicable law. The District Court ruled that the award of the escalator maintenance contract was neither irrational nor in violation of applicable law but nonetheless granted Elcon limited equitable relief to remedy perceived "taint" in the process of awarding the contract. *Elcon Enter., Inc. v. Washington Metro. Area Transit Auth.*, 770 F.Supp. 667 (D.D.C. 1991). Although we agree that the contract award was not irrational or in violation of applicable law, we reverse in part because once the District Court reached that correct conclusion it lacked the authority to grant any remedy at all.

## I.

The material facts of record are as follows. WMATA was created by interstate compact between Maryland, Virginia, and the District of Columbia, duly approved by Congress, *see* D.C.Code § 1–2411 (1992 Repl.Vol.), to construct and operate a transit system, consisting of buses and subways, for the Washington, D.C. metropolitan area. From 1977 to 1983, Westinghouse Elevator Co., which became Schindler after a 1989 buy-out,[1] maintained and repaired escalators for WMATA's subway stations under successive sole source contracts with WMATA. In 1983 WMATA and Schindler entered into a two-year escalator maintenance contract, which they ex-

tended by mutual agreement until December 31, 1989. As the contract's expiration date was drawing near, WMATA, in April 1989, issued a Request for Proposal for Maintenance of Metrorail Escalators ("RFP").

According to the RFP, WMATA would utilize its "competitive negotiation" procedures throughout the process of awarding the escalator contract, which was worth more than $20 million over the three-year life of the contract. Proposals would be evaluated under the following criteria, which the RFP listed "in descending order of importance:" (1)"General Quality and Responsiveness of Proposal," (2) "Organization and Personnel," (3) "Previous Experience of Proposing Firm," and (4) "Disadvantaged Business Enterprise Participation" ("DBE"). The RFP further provided that "the contract shall be awarded to that proposer submitting the most favorable technical and business/cost proposal as determined through the evaluation process," assuming the requirements of the DBE program were met.

WMATA's DBE program, described in Appendix B to the RFP, aspired to achieving at least 36% participation by minorities or women in WMATA projects. The DBE requirement could be satisfied in two ways. First, the requirement was satisfied if the proposer itself was a DBE, defined as any company with at least 51% ownership and management by "one or more socially or economically disadvantaged individuals." *RFP*, at B–1. Second, the requirement was satisfied if the non-DBE proposer pledged to give at least 36% of the work under the contract to DBEs through subcontracting or joint ventures. *Id.* If a proposer could not satisfy the DBE requirement through either of these methods, it could request a full or partial waiver, but WMATA would grant a waiver only if it determined that the proposer had made good faith efforts to satisfy the DBE requirement. Because no proposal could "be considered responsive" unless it complied with the DBE requirement, the RFP required each proposal to evidence compliance by one of these two

---

**1.** Hereinafter, both Westinghouse and Schindler are referred to as "Schindler."

methods. Each proposal was required to include:

> 1. [A] "Schedule of DBE Participation" and "Letter of Intent to Perform as Subcontractor" sufficient to meet the goals or portion of the goals set forth in this Appendix [Appendix B];
>
> OR
>
> 2. A request for waiver of the goals or portion of the goals and reasons thereto as stipulated in Number 5 of Appendix B.

*RFP on Contract N–47886*, at 12 (Apr. 6, 1989).

Although three proposals were submitted for the escalator contract, only two, those of Elcon and Schindler, were in the competitive range. Elcon fulfilled the goal of 36% DBE participation whereas Schindler, which had only 2.2% DBE participation, submitted a waiver for the remaining 33.8%. WMATA's Technical Evaluation Team ("TET") reviewed the proposals and awarded Elcon's lower-cost proposal a perfect score of 50. Schindler came in a close second with a score of 49.2. A WMATA procurement official, finding it odd that Elcon could outscore Schindler given the latter's status as the incumbent on the contract and the former's limited experience in large-scale elevator maintenance, ordered the TET to re-score the proposals, giving greater weight to the proposers' experience. After doing so, the TET gave Schindler the higher score (76.77), as compared with Elcon's 74.66. WMATA then ordered submission of Best and Final Offers ("BAFO"), but the BAFOs resulted in no relative score change (Schindler received 85.7 points and Elcon received 83 points).

Meanwhile, WMATA's Office of Civil Rights ("CIVR") had reviewed the proposals for compliance with the DBE requirement. CIVR found that Elcon had met the 36% goal and stated that an award to Elcon would be acceptable from its standpoint. However, CIVR found that Schindler "has not made a 'good faith effort'" to satisfy the DBE requirement, *CIVR Recommendation* at 1, notwithstanding the fact that Schindler's BAFO showed an increase in DBE participation from 2.2 to 2.6%. Accordingly, CIVR stated it "[could not] concur in the award of this contract to [Schindler], unless there is a demonstrated concerted effort to involve DBEs in a meaningful way in this procurement." *Id.*

The scoring data and the CIVR's DBE evaluation were then passed on to the Technical/Business Cost Panel, which recommended that Schindler, having received the highest score, be awarded the escalator contract. The Contracting Officer disagreed with that recommendation, finding instead that the award should go to Elcon, as the lowest-cost proposer, since he viewed the proposals as "substantially equal technically." Both the Assistant General Manager and the Acting General Manager accepted the Contracting Officer's recommendation. They therefore recommended that WMATA's Board of Directors (the "Board"), which had the sole power to award contracts worth more than $100,000, award Elcon the contract.

From the date of the recommendation to the Board, September 28, 1989, to the Board's meeting on October 5, 1989, Schindler had several *ex parte* communications with WMATA and the Board. The first was a telephone call from Schindler's Transit Manager, James Iannacone, to Harold Rose, a member of WMATA's Technical/Business Cost Panel. During that conversation, Iannacone incorrectly informed Rose that Schindler was called in to replace Elcon on the National Airport escalator contract *because* of Elcon's inability to handle the contract adequately. In fact, Schindler had taken over the Airport contract for reasons other than any shortcomings of Elcon's. The Contracting Authority at National Airport later informed WMATA that Elcon had performed "satisfactorily" and that there had been "no complaints of deficient performance." Schindler nonetheless repeated the allegation about Elcon in a second *ex parte* communication, a letter, dated October 4, 1989, to the Chairman of the Board. When the Board convened in Executive Session on October 5, 1989, Schindler further informed the Board that it would not sign another contract awarded

it until the Board had awarded the escalator contract and that it might challenge the constitutionality of WMATA's DBE program if the Board did not award it the escalator maintenance contract.

At the October 5 meeting, the Board, faced with Schindler's threat to sue and allegations against Elcon, requested further guidance as to Elcon's ability to perform the contract and Schindler's efforts to comply with the DBE requirement. The next day, WMATA officials met with Elcon representatives to give them a chance to refute Schindler's claims about the National Airport contract and Elcon's inability to handle the escalator contract. After Elcon's presentation, the officials with whom it had met concluded that Elcon could handle the contract and that Schindler's allegations about the Airport contract were inaccurate. Five days later, Schindler filed a contingent protest with the Board, to take effect if Schindler was not awarded the escalator contract.

Shortly thereafter, Elcon engaged in a series of *ex parte* contacts of its own with WMATA staff (but not the Board, as WMATA itself concedes). Elcon wrote the Contracting Officer and General Manager on October 26, 1989, arguing that Schindler's request for a DBE waiver should be denied. On November 2, 1989, acting on rumors that WMATA had delayed final action as a result of *ex parte* contacts with Schindler, Elcon again wrote the General Manager that Schindler's proposal should be rejected as nonresponsive for failure to satisfy the DBE requirement, this time threatening to challenge through protest or lawsuit an award to Schindler.

Knowing that if it awarded the contract to Schindler, Elcon might well sue, and if it awarded the contract to Elcon, Schindler might well sue, challenging not just the contract award but the constitutionality of the entire DBE program, the Board accepted the recommendations of staff that it request a second round of BAFOs to allow Elcon to demonstrate technical capability and Schindler to demonstrate good faith efforts to satisfy the DBE requirement. At that meeting, the Board appointed an advisory body called the "Ad Hoc Panel" to review the new BAFOs. The Ad Hoc Panel included (1) the Deputy Assistant Manager of WMATA's Department of Design, Construction, and Facilities Maintenance; (2) WMATA's CIVR Director; and (3) WMATA's Director of Procurement (who also was the Contracting Officer for the escalator contract). WMATA officials then met with Elcon and Schindler on November 16 and 17, 1989, respectively, to inform them of the Board's concerns regarding their proposals and to encourage them to include any additional information they deemed pertinent with their new BAFOs. Within weeks the new BAFOs were submitted to the Ad Hoc Panel. Schindler's BAFO was unchanged from its first, except that it showed an increase in DBE participation from 2.6 to 10.3%. Elcon likewise submitted the same BAFO as before, except that it included two additional personnel (one with financial and the other with elevator experience) and lowered its already lowest-cost proposal by $574,059.

After meetings with both Elcon and Schindler on December 6, 1989, the Ad Hoc Panel issued a report to the General Manager, in which it concluded, contrary to the Contracting Officer's earlier recommendation, that the contract should be awarded to Schindler. The Panel advised that it had limited its inquiry to the two concerns raised by the Board—Schindler's DBE participation and Elcon's technical ability—and thus did not re-score the proposals. Had the proposals been re-scored, Elcon would have received the highest score due to its price cut. As to the first issue before it, the Panel concluded that in the time since the prior CIVR recommendation to the contrary, Schindler had made a good faith effort to comply with the DBE requirement. On the second issue, the Panel concluded that although Elcon had the technical ability to perform the contract, it lacked "the practical experience to meet safety and availability standards" such as the 98% availability and two-hour response time requirements of the escalator contract. The Panel also concluded that Elcon had failed to satisfy doubts about its "ability to rapidly expand its operations to accommodate a

contract of this magnitude." *Id.* In making these determinations, the Panel noted that Elcon's largest project to date, the Bethesda Naval Medical Hospital project, was "less than ten percent of the annual WMATA contract amount" and that only one of Elcon's eleven proposed managers had prior escalator experience. *Id.*

The Board accepted the Panel's recommendation and awarded the three-year contract to Schindler on December 14, 1989. Elcon filed this lawsuit one week later. After the completion of discovery, all parties moved for summary judgment. The District Court ruled that the decision to award Schindler the contract had a rational basis and that neither the award decision nor the procedures leading up to it violated applicable law. *Elcon Enter., Inc. v. Washington Metro. Area Transit Auth.,* 770 F.Supp. 667 (D.D.C.1991). Nevertheless, the court ruled that the parties' *ex parte* contacts with WMATA had "tainted" the entire process and that Elcon was therefore entitled to limited equitable relief in the form of an order compelling WMATA and Schindler to reimburse Elcon for its bid preparation costs or requiring WMATA to re-evaluate the competing bids.

All parties have appealed to this Court. Elcon contends that the District Court erred in upholding the escalator maintenance contract award and in declining to issue an injunction ordering WMATA to award Elcon the contract. Failing these arguments, Elcon claims that the District Court's finding that the contract award process was tainted by *ex parte* contacts was correct and fully justified the limited relief the District Court awarded it. By contrast, WMATA and Schindler defend the District Court's ruling that it was neither irrational nor violative of applicable law for WMATA to award the contract to Schindler and argue that very ruling, as a matter of law, prevented the District Court from awarding Elcon any relief.

After setting forth the standard of review that guides our inquiry here, we consider each of these arguments in turn below.

## II.

### A. *Standard of Review*

Because we here review a ruling on summary judgment, we do not defer to the conclusions the District Court drew from the record, but make a *de novo* determination. *Shields v. Eli Lilly & Co.,* 895 F.2d 1463, 1465–66 (D.C.Cir.1990); *Parmac, Inc. v. International Ass'n of Machinists Nat'l Pension Fund Ben. Plan,* 872 F.2d 1069, 1071 (D.C.Cir.1989).

 This Court may not set aside federal agency procurement decisions unless they "had no rational basis" or the process by which they were reached "involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973); *see also Irvin Indus. Canada, Ltd. v. United States Air Force,* 924 F.2d 1068, 1072 (D.C.Cir.1990); *Delta Data Sys. Corp. v. Webster,* 744 F.2d 197, 204 (D.C.Cir.1984). We emphasize, as prior cases have, that a procurement decision is not "irrational" simply because we might have reached a different decision in the first instance. *See, e.g., Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978) (holding that agency decisions may not be set aside "simply because the court is unhappy with the result reached"); *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1299 (D.C.Cir.1971) (cautioning that "[a] court has no warrant to set aside agency action" based merely on the court's displeasure with the result) (internal quotation marks omitted); *Calcutta East Coast of India and East Pakistan/USA Conference v. Federal Maritime Comm'n,* 399 F.2d 994, 997 (D.C.Cir.1968) (same).

 Nor may courts set aside a procurement decision on the ground that the procuring agency potentially or actually violated applicable law in some trivial way—the violation must have been *clear and prejudicial. Irvin Indus.,* 924 F.2d at 1072; *Kentron,* 480 F.2d at 1169. As the Supreme Court has held, "[a]dministrative decisions should be set aside in this context,

as in every other, only for *substantial* procedural or substantive reasons." *Vermont Yankee,* 435 U.S. at 558, 98 S.Ct. at 1219 (emphasis added). This burden obviously is a "heavy" one. *Irvin Indus.,* 924 F.2d at 1072; *Kentron,* 480 F.2d at 1169. Our refusal to demand any more of an agency's procurement decision than substantial compliance with applicable law and baseline substantive rationality is necessary, for "[j]udges are 'ill-equipped to settle the delicate questions involved in procurement decisions,'" *Delta Data,* 744 F.2d at 203 (quoting *Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1271 (5th Cir.1978)), and to require any more of such decisions would make courts "the forum for all manner of objections to procurement decisions—objections that counsel can readily relate to the language of some provision or other in some procurement regulation—and would be propelled without adequate preparation into a tangle of complex statutory and decisional rules." *M. Steinthal & Co.,* 455 F.2d at 1302.

B. *WMATA's Status as a Federal Agency*

While the parties agree that the *Kentron* standard of review discussed above applies in this case, they disagree on the predicate for applying that standard—namely, that the entity awarding the contract be a *federal agency.* Although this Court has not previously addressed whether WMATA is to be treated as a federal agency, several district courts in this Circuit have. Unfortunately, they have reached opposite results. Equally unfortunate is the fact that the parties presently before this Court have devoted so little attention to this important question.

Elcon claims that WMATA is a federal agency and that federal law limiting agency action, *e.g.,* the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* (1983), and the Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 14.501 *et seq.*

(1991), consequently applies to WMATA. In support of this position, Elcon cites *The Bootery, Inc. v. Washington Metro. Area Transit Auth.,* 326 F.Supp. 794 (D.D.C. 1971), and *Otis Elevator Co. v. Washington Metro. Area Transit Auth.,* 432 F.Supp. 1089 (D.D.C.1976), which were recently followed in *Seal & Co. v. Washington Metro. Area Transit Auth.,* 768 F.Supp. 1150 (E.D.Va.1991). Of particular interest here is *Seal & Co.,* where the District Court held that "Congress intended WMATA to conduct its procurements as a federal agency would." *Id.* at 1157.

Unlike Schindler, which apparently concedes that WMATA is a federal agency, WMATA argues that *Seal & Co., The Bootery* and *Otis Elevator* merely treated it as an agency for purposes of standing to challenge WMATA procurement decisions in federal court. Since Elcon's standing to challenge the escalator maintenance contract award is not at issue, WMATA submits, these cases are inapposite. The controlling precedent, WMATA claims, is this Court's decision in *Washington Metro. Area Transit Auth. ex rel. Noralco Corp. v. Norair Eng'g Corp.,* 553 F.2d 233, 235–36 (D.C.Cir.1977) (per curiam), where, without explicitly ruling on the issue, we cited the holding in *Saunders v. Washington Metro. Area Transit Auth.,* 359 F.Supp. 457 (D.D.C.), *remanded on other grounds,* 486 F.2d 1315 (D.C.Cir.1973), that:

> Metro was created by Interstate Compact and is an agency only of its constituent jurisdictions. The Compact was ratified by Congress, as required by the Constitution for all such Compacts and was authorized and approved by Congress on behalf of the District of Columbia as a signatory jurisdiction. But Plaintiff has offered nothing which indicates that Metro thereby became a Federal agency.

359 F.Supp. at 460 (footnotes omitted). Therefore, neither the APA nor the FAR apply to it, WMATA contends.[2]

---

**2.** WMATA apparently has overlooked the fact that if the APA does not apply, there is a serious question whether Elcon has a federal cause of action for judicial review of WMATA's procure-

ment decisions. While the District Court in *Seal & Co.* concluded that disappointed bidders or proposers have an implied cause of action under the WMATA compact, the parties have

In view of our conclusion, it is unnecessary to resolve the issue. It is sufficient, for purposes of this appeal, to assume *arguendo* that WMATA is a federal agency. We do note, however, that *Saunders* does seem to conflict with *Morris v. Washington Metro. Area Transit Auth.*, 781 F.2d 218, 222 (D.C.Cir.1986), where we recognized (admittedly in another context) Congress's "particularly active role in creating WMATA" and concluded that "[t]here seems no question that the United States could validly confer its [sovereign] immunity upon WMATA" as a federal agency or instrumentality. We therefore assume, for purposes of this case, that WMATA is a federal agency and that its procurement decisions must be reached in accordance with the APA and applicable federal procurement law.

### III.

#### A. *The Substantive Rationality of WMATA's Contract Award*

■ Of Elcon's numerous claims that WMATA acted irrationally, only three are substantial enough to require discussion. Elcon's first contention is that the WMATA Board ignored the recommendations of its staff. These recommendations include: (1) the TET's initial scoring of the two proposals, which rated the Elcon proposal higher than Schindler's; (2) the CIVR's recommendation that Schindler had failed to demonstrate the required good faith efforts to comply with the DBE requirements, whereas Elcon had complied therewith; and (3) the Contracting Officer's recommendation that the contract be awarded to Elcon as the lowest-cost proposer since its proposal and Schindler's were substantially equivalent technically. Because all of these bodies or officers had greater expertise in their respective areas of responsibility than the Board and the Ad Hoc Panel, Elcon argues, the Ad Hoc Panel and the Board should have followed their recommendations.

We reject this argument for several reasons. First, we fail to see how it was

irrational to have the TET recalculate the proposers' scores when it was determined that the TET had given inadequate weight to the proposers' relative experience in similar projects. After all, the RFP itself listed "Previous Experience of [the] Proposing Firm" as one of the three most important factors for evaluating the proposals. It seems to us perfectly rational for WMATA to direct its staff to give consideration to a factor listed as relevant in the RFP.

Second, Elcon misstates matters when it argues that the Board and its Ad Hoc Panel ignored the CIVR recommendation that Schindler had not made good faith efforts to satisfy the DBE requirement. It is clear to us that the CIVR merely determined that *based on the first BAFO*, Schindler had not made such efforts. *See CIVR Recommendation* at 1. During the second round of BAFOs, as we have seen, Schindler increased its DBE participation from 2.6% to 10.3%, at which time the Ad Hoc Panel, with the concurrence of the CIVR Director, concluded Schindler had made a good faith effort to comply. Thus, far from ignoring the CIVR recommendation, WMATA took it to heart and convinced Schindler to increase significantly its level of DBE participation.

Third, and more fundamentally, Elcon cannot escape the fact that the final decisionmaker in this procurement was the Board. There is simply no support for the proposition that superior decisionmakers are duty-bound to follow the recommendations of staff. Instead, we find most persuasive the notion that such superior decisionmakers are "not bound by the recommendations of evaluation and advisory groups, and may agree or disagree with the findings submitted by those groups." *BMY, Div. of Harsco Corp. v. United States*, 693 F.Supp. 1232, 1247 (D.D.C. 1988). Consequently, even if WMATA reached a decision at odds with staff recommendations, that fact does not mean or even suggest that WMATA acted irrationally.

not raised that issue. Because it is not a jurisdictional issue, *Bell v. Hood,* 327 U.S. 678, 681–

82, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), we express no opinion on it.

Elcon next argues that it was irrational for the Board to request a second round of BAFOs and to appoint the Ad Hoc Panel. Because the initial round of BAFOs and the negotiations pursuant thereto adequately addressed both the issue of Schindler's DBE participation and Elcon's technical ability, requesting another round of BAFOs to be reviewed by the Ad Hoc Panel was irrational since doing so entailed a waste of time and resources. We cannot accept this argument. Far from being a waste of time and money, requesting second-round BAFOs to be reviewed by the Ad Hoc Panel was altogether proper under 48 C.F.R. § 15.611(c) (1991) because WMATA had legitimate unresolved concerns regarding both proposals and because WMATA was required to allow both parties an opportunity to respond to the *ex parte* information WMATA had received about their proposals. *See Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 203 (D.C.Cir.1984) (stating that agency failure to give adversary opportunity to comment on *ex parte* information would constitute "an abuse of discretion"). Indeed, as a general matter, gathering more relevant information would seem to make the final decision better informed and therefore *more*, not less, rational.

Lastly, citing this Court's leading precedents on *ex parte* contacts under the APA, *Home Box Office, Inc. v. FCC*, 567 F.2d 9 (D.C.Cir.1977) (*HBO*), and *Action for Children's Television v. FCC*, 564 F.2d 458 (D.C.Cir.1977), Elcon argues that WMATA's decision to award the escalator maintenance contract to Schindler was rendered invalid by Schindler's *ex parte* contacts with WMATA. These contacts included Schindler's threats to challenge the constitutionality of the DBE program if WMATA awarded Elcon the contract, false allegations of substandard performance by Elcon on the National Airport contract, and refusal to sign an unrelated contract until WMATA acted on the escalator maintenance contract. Elcon argues that WMATA never informed Elcon of Schindler's threats or false allegations yet relied on those communications with Schindler in awarding the contract, and that therefore the following language from the *HBO* precedent compels the conclusion that WMATA's award decision was arbitrary:

[W]here, as here, an agency justifies its actions by reference only to information in the public file while failing to disclose the substance of other relevant information that has been presented to it, a reviewing court cannot presume that the agency has acted properly, but must treat the agency's justifications as a fictional account of the actual decision making process and must perforce find its actions arbitrary.

567 F.2d at 54–55 (citations omitted).

WMATA and Schindler respond that Elcon's reliance on *HBO* is misplaced because WMATA did not rely on Schindler's threats or misinformation about the National Airport project in giving Schindler the contract. WMATA staff, after consultation with Elcon (both through an in-person meeting and the second-round BAFO), resolved the issues Schindler raised about Elcon's performance on the project in Elcon's favor, and the Ad Hoc Panel concurred with their recommendation. The decision not to award Elcon the escalator contract, WMATA and Schindler argue, had nothing to do with the issues raised in contacts with Schindler. In the alternative, they contend, the *HBO* precedent does not apply here because WMATA sufficiently disclosed the *ex parte* information to Elcon and afforded it an adequate opportunity to respond.

Unlike the parties, we read *HBO* as applying *only* to rulemaking. Indeed, it makes no sense to apply *HBO* to WMATA's competitive negotiation procedures because under such procedures, in sharp contrast to the APA's rulemaking procedures, "the contracting officer is permitted and encouraged to conduct oral and written discussions with offerors whose proposals vary from the RFP." R. NASH & J. CIBINIC, FORMATION OF GOVERNMENT CONTRACTS 524 (1986). For this reason, we believe the propriety of *ex parte* contacts in agency procurement processes must be judged according to *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 203 (D.C.Cir.1984),

which held that procuring agencies must provide bidders or proposers about whom negative *ex parte* information is received the opportunity to comment on the information.

■ We agree with WMATA and Schindler that WMATA's diligent efforts to ensure that Elcon knew of, and had an opportunity to respond to, the negative *ex parte* information cured any defect that might otherwise have resulted from the *ex parte* contacts. After WMATA had *ex parte* communications with both Elcon and Schindler regarding the other, the Board ordered a second round of BAFOs to allow both proposers to address the concerns raised— in the case of Schindler, its good faith efforts to comply with the DBE requirement and, in the case of Elcon, its technical ability to perform the contract and its experience in handling large-scale escalator maintenance projects. Then on November 16 and 17, 1989, WMATA staff met with representatives of both proposers to inform them of these concerns and to ask them to provide any information that might satisfy those concerns. As the Board handled the matter, Elcon was thus given *two* opportunities—in meetings with WMATA staff and in the new BAFOs—to address the doubts the Board had about its proposal. As a matter of law, such efforts, particularly ordering another round of BAFOs, cured any defect that might otherwise arise from the *ex parte* contact about Elcon after the first round of BAFOs.

■ We note, however, that WMATA apparently never told Elcon of Schindler's threatened challenge to the legality of the DBE program. Elcon has offered nothing to suggest that legal arguments, as opposed to factual allegations, afford competing proposers a right to be notified and heard. Because Schindler's threat to sue brought nothing to the Board's attention that it was not already aware of—a suit by a disappointed bidder must often be anticipated—we hold that WMATA was not required to inform Elcon of Schindler's threat to sue.

■ We finally come to the rationality of the end result of this procurement—the award of the escalator maintenance contract to Schindler. As we see it, a decision to award the contract to a higher-cost but more experienced contractor is not irrational. Here, Schindler had satisfactorily performed the system-wide elevator maintenance contract for WMATA for twelve years before this procurement, a fact that won it the highest combined technical and business cost proposals score from the TET. In sharp contrast, Elcon only had one manager who had prior escalator experience and had not handled a project one-tenth of the size of the WMATA contract. The Ad Hoc Panel convincingly summarized the situation as follows:

> The importance of the escalators to WMATA's rail service warrants reliance on hard experience, versus theoretical plans and good intentions. Elcon's proposal falls short in demonstrating training and technical experience in maintaining WMATA's particular type of escalators. WMATA would risk a degradation in service and safety while Elcon acquired on-the-job experience.

*Report of the Ad Hoc Panel* at 3 (1989). We accordingly agree with the District Court that awarding the contract to Schindler was rational—indeed, eminently so.

B. *WMATA's Compliance with Applicable Law*

Basically, Elcon claims that everything that allegedly made the WMATA award decision "irrational" also violated the APA, WMATA's own procurement regulations, and the FAR. First, Elcon claims that under *HBO*, 567 F.2d at 54–55, WMATA's *ex parte* contacts with Schindler rendered the ultimate award "arbitrary and capricious." As we noted in the previous section, however, *HBO* applies only to rule-making, not WMATA's competitive negotiation procedures; therefore, the *ex parte* contacts did not violate the APA.

■ Second, Elcon claims that because no procurement regulation expressly authorized the Board to appoint the Ad Hoc Panel, the Board's decision to do so violated the procurement regulations. This contention strikes us as frivolous. Under

*Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973), Elcon must carry the "heavy" burden of showing a "clear and prejudicial violation" of applicable law. Plainly, to meet that burden, Elcon, as the disappointed proposer, must *identify* a statute or regulation that WMATA supposedly violated clearly and prejudicially. To accept Elcon's argument would be to shift the burden from the disappointed proposer or bidder onto the agency, thereby opening the floodgates for challenges to agency procurement decisions. This we may not do. *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301–02 (D.C.Cir.1971).

■ Third, Elcon asserts that by failing expressly to find that the higher price of Schindler's proposal was justified by its technical superiority, WMATA violated its regulation providing that in competitive negotiation, "[a]s a practical matter, awards to other than the low proposer which meets the Authority's needs will only be made when it can be shown that the technical superiority of the higher priced proposal outweighs the additional costs involved." *WMATA Procurement Regulations* at 3. While Elcon has at least identified a regulation, we do not think it can be said that WMATA violated it. The cited regulation nowhere requires WMATA to make express findings that the added cost of a higher-cost proposal is attributable to its technical superiority. Quite plainly, the quoted passage from WMATA's regulation, which appears to be nothing more than an introduction to the regulations that follow, merely informs prospective proposers that if their proposals cost more than competing ones, *they* should be prepared to show the added cost is justified by their proposals' technical superiority.

■ Fourth, Elcon claims that WMATA violated a provision of the FAR, 48 C.F.R. § 14.503–1(e)(2) (1991), which provides that "[a]ny proposal which ... fails to conform to the essential requirements or specifications of, the request for technical proposals shall be considered nonresponsive and categorized as unacceptable," by not rejecting Schindler's proposal for noncompliance with the DBE requirement. As Elcon reads this provision, WMATA had a duty to reject Schindler's proposal when the CIVR concluded that Schindler had not made good faith efforts to satisfy the DBE requirement, and to award Elcon the contract since the Contracting Officer had determined the Elcon proposal was "substantially equal technically" to Schindler's. Elcon concludes that WMATA's failure to disqualify the Schindler proposal was a clear and prejudicial violation of § 14.503–1(e)(2).

■ We find this argument unpersuasive since it rests on a fundamental misunderstanding of negotiated procedures. Unlike "sealed bidding" or "formal advertising" procedures, competitive negotiation procedures, such as those WMATA employed in this case, "are designed to be flexible and informal," 47 Comp.Gen. 279, 284 (1967), and therefore are not fully subject to the strict requirements of sealed bidding. *Id.* (explaining that negotiated procedures "properly permit the contracting officer to do things in the awarding of a negotiated contract that would be a radical violation of the law if the procurement were being accomplished by formal advertising"). Among these is the "responsiveness" requirement, under which the Contracting Officer must reject as "nonresponsive" sealed bids that do not conform to the material requirements set forth in the Invitation for Bids ("IFB"). *Toyo Menka Kaisha, Ltd. v. United States,* 220 Ct.Cl. 210, 597 F.2d 1371, 1376–77 (1979).

As we have made clear, responsiveness "does not carry the strict overtones" in competitive negotiation that it carries in sealed bidding because there "the very concept of responsiveness is a subject of negotiations." *Kentron,* 480 F.2d at 1171. We find the following explanation convincing:

[N]egotiation does not involve the concept of responsiveness developed in sealed bidding even though the term is sometimes used in negotiations. The concept of responsiveness was developed in sealed bidding where a contracting officer is prohibited from considering a bid which deviates from the IFB. *This prohibition is not applicable to negotiation where the contracting officer is*

*permitted and encouraged to conduct oral and written discussions with offerors whose proposals vary from the RFP.*

R. NASH & J. CIBINIC, FORMATION OF GOVERNMENT CONTRACTS 523–24 (1986) (emphasis added) (citation omitted). In recognition of these settled principles of procurement law, 48 C.F.R. § 14.503–1(e)(2), the FAR section on which Elcon relies, applies only to "two-step bidding," which represents a middle ground between the extremes of negotiated procedures and formal procedures. *Id.* As a result, even if Schindler's initial proposal did not fulfill the DBE requirement, it was entirely proper, absent a responsiveness requirement in WMATA's regulations or the RFP, to negotiate with Schindler to see if it was willing to fulfill the requirement, *not* to disqualify the proposal outright.

■■■ However, Elcon correctly points out several instances where WMATA appears expressly to have incorporated a responsiveness requirement even in the negotiated procedure employed here. *See RFP* at 6 (providing that WMATA would "award a contract to that responsive, responsible proposer whose proposal conforming to this Request for Proposal, is most advantageous to the Authority"); *WMATA Procurement Regulations* at 5 (providing that "[b]asic questions will not be left for later agreement during supplemental proceedings"). Here the difficulty we have with Elcon's argument is that it ignores the RFP's definition of what is required in order to be responsive to the DBE requirement. The RFP states that to "be considered responsive" to the DBE requirement, each proposal must include:

1. [A] "Schedule of DBE Participation" and "Letter of Intent to Perform as Subcontractor" sufficient to meet the goals or portion of the goals set forth in this Appendix [Appendix B];

OR

2. A request for waiver of the goals or portion of the goals and reasons thereto as stipulated in Number 5 of Appendix B.

*RFP*, at 12. Therefore, Schindler's proposal was responsive to the DBE requirement because it included a request for a waiver, accompanied by the required documentation.

For the reasons discussed above, the District Court was correct in ruling that Elcon failed to carry its burden of showing that WMATA had committed clear and prejudicial violations of applicable law in awarding the escalator maintenance contract to Schindler.

## IV.

■■■ The final issue—whether or not a court, having found that an agency's procurement decision is permissible under *Kentron,* may grant the disappointed bidder a remedy—may be disposed of in short order. We think it altogether logical that where an agency's procurement decision has a rational basis and was reached in accordance with applicable law, no remedy should be awarded. This is, we think, implicit in the decision the District Court relied on in granting Elcon limited equitable relief, *Delta Data Sys. Corp. v. Webster,* 744 F.2d 197 (D.C.Cir.1984). There we stated, "[t]he court's role in reviewing agency contract decisions *is limited to* determining whether the agency acted in accord with applicable statutes and regulations and had a rational basis for its decisions." *Id.* at 204 (emphasis added) (citing *Kentron Hawaii Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973); *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)). While it is true, as the District Court noted, that *Delta Data* allowed a disappointed bidder to have the agency there reconsider its bid or compensate it for its bid-preparation costs, it did so only *after* concluding that the "award of the contract to [the successful bidder] was unlawful." *Id.* at 203. Nothing in that decision, or any other of which we are aware, allows a court to remedy "taint" in this context short of irrationality or clear and prejudicial violation of applicable law.

As the Third Circuit has held, "once the district court, having considered allegations that the agency's decision lacked sufficient

factual basis, was tainted by procedural irregularities, and so on, nevertheless determines that an agency's procurement decision was rational," *Princeton Combustion Research Labs. v. McCarthy*, 674 F.2d 1016, 1022 (3d Cir.1982), and not in clear and prejudicial violation of applicable statutes or regulations, *Kentron Hawaii Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir. 1973), "its inquiry is at an end." *Princeton Combustion Research Labs.*, 674 F.2d at 1022. However inequitable it may seem in a particular case, an agency's procurement decision is either in violation of the standard of review, in which case a remedy is required, or it is not, in which case a remedy is improper. Therefore, since the District Court correctly found that WMATA's decision to award the escalator maintenance contract to Schindler was a rational one reached in compliance with applicable law, it was reversible error for the court to grant Elcon even the limited relief it did.

## CONCLUSION

The District Court correctly found that WMATA's decision to award the important and sizeable escalator maintenance contract to the more experienced proposer, Schindler, and the procedures employed in reaching that decision, were neither irrational nor in violation (much less in "clear and prejudicial" violation) of applicable law. However, the District Court exceeded its authority by awarding a remedy in the face of its undeniably correct rulings that WMATA's decision was rational and otherwise proper. Accordingly, the judgment of the District Court is

*Affirmed in part, and reversed in part.*